GREENEBAUM–MOUNTAIN
MORTGAGE COMPANY,
Plaintiff,

v.

PIONEER NATIONAL TITLE INSUR-
ANCE COMPANY, Defendant,

v.

DUANE INVESTMENTS, INC., et al.,
Third-Party Defendants.

Civ. A. No. 75–F–569.

United States District Court,
D. Colorado.

Nov. 1, 1976.

---

Jack N. Hyatt, Judith D. Levine, Brown-
stein, Hyatt, Farber & Madden, Denver,
Colo., for Greenebaum-Mountain Mortg. Co.

James E. Brown, Charles Haines, Nana-
ruth Haines, Grant, McHendrie, Haines &
Crouse, Denver, Colo., for Pioneer Nat. Ti-
tle Ins. Co.

## MEMORANDUM OPINION AND ORDER

FINESILVER, District Judge.

THIS MATTER comes before the Court on Defendant's Motion for Withdrawal of Plaintiff's Counsel. The Motion, which was an alternative motion filed in the event that this Court denied Defendant's cross motion for summary judgment, is based on Canon 5 of the Code of Professional Responsibility. This Court denied Defendant's cross motion for summary judgment on August 18, 1976. The Court then scheduled a hearing on the motion to disqualify in accordance with the Tenth Circuit's ruling in *Fullmer v. Harper*, 517 F.2d 20 (10th Cir. 1975).

At the hearing Plaintiff and Defendant submitted the motion upon affidavits, exhibits and Defendant's Designation of Record Re Hearing on Withdrawal of Plaintiff's Counsel. The Court has reviewed the papers filed at the hearing, the briefs, and has conducted its own research into the issues presented. After carefully weighing the various interests involved, we rule that only attorney Kenneth Robins need be disqualified from further participation as an attorney in this lawsuit. Attorneys from the law firm of Messrs. Brownstein, Hyatt, Farber and Madden, other than Mr. Robins, may continue their participation in this litigation.

### FINDINGS OF FACT

Many of the factual contentions in this lawsuit are still in dispute. As noted above, on August 18, 1976 this Court denied cross-motions for summary judgment for the reason, *inter alia*, that genuine issues of material facts remained outstanding. In *Fullmer v. Harper*, the Tenth Circuit mandated that trial courts, in ruling on motions for disqualification of counsel, make specific findings of fact and conclusions of law "to the end that [the appellate] court will then have a record before it which will permit a meaningful review, should review be sought." 517 F.2d at 20.

Defendant's position in this motion is that Mr. Robins was deeply involved in the negotiations which led to the present impasse. In particular, Mr. Robins drafted what is alleged to be an agreement between Plaintiff and Defendant which, in a serious way, could be determinative of the outcome of the litigation. Defendant contends that Mr. Robins will be called as a witness at the trial of this lawsuit and for that reason, under Canon 5 of the Code of Professional Responsibility, he and his law firm should be disqualified from further participation in the litigation.

Because the facts of this motion are inextricably bound with the merits of the case itself, *Fullmer's* requirement of findings of fact puts this Court in a difficult position. While the Court shall make such findings, we wish to underscore that the Court is not prejudging any of the issues which are to be litigated at the trial itself.

Any "findings" which are made, however, shall be restricted to use in the decision of this motion and, of course, to the use of any appellate court reviewing the Court's order. These findings shall in no way be binding upon the parties for any other purposes in this litigation.

### I

In July of 1973 Greenebaum-Mountain Mortgage Company entered into a construction loan agreement with Hill Pond Development Corporation. The agreement provided for the construction of some 70 residential housing units on 8.4 acres of Hill Pond's 98 acre tract in Fort Collins, Colorado. To facilitate the orderly progression of the project, Greenebaum and Hill Pond signed a construction disbursement escrow agreement [C.D.E.] with Defendant Pioneer National Title Insurance Company (Defendant's Exhibit A–18).[1] The C.D.E. provided that Pioneer was to disburse the funds loaned to Hill Pond as certain phases of construction were completed. In the event the project was not completed according to

---

1. Unless otherwise noted, all exhibit references are to Defendant's Designation of Record Re Hearing on Withdrawal of Plaintiff's Counsel and exhibits attached thereto.

schedule, paragraph thirteen of the C.D.E. provided:

13. That should Owner [Greenebaum] and Contractor [Hill Pond] fail to complete in accordance with the terms hereof, Escrowee [Pioneer] is obligated to Lender [Greenebaum], at Escrowee's option, either (a) to complete the improvements substantially in accordance with plans and specifications, or (b) to purchase Lender's note and mortgage by paying Lender all sums then due under said instruments. . . . (footnote omitted)

Greenebaum alleges that Pioneer was to have monitored the progress of the construction so that it could intelligently disburse the loan funds under the C.D.E. Pioneer maintains that it had no obligation to monitor the project, although for some months a Pioneer subsidiary did, in fact, report on the advances made on the project. By May of 1974, Hill Pond was seriously "out of balance" in regard to the state of the construction compared with the expenditures of the loan proceeds. Pioneer alleges that an official of Greenebaum informed Pioneer that, as of June 25, 1974, the project was not in default or behind schedule.

Greenebaum gave Hill Pond "official" notice of default on the construction loan agreement in October of 1974 and therein made a demand for payment of the promissory note in accordance with the acceleration clause of the note. To satisfy the demand, Hill Pond proposed to transfer its fee interest in the 98 acre site to Greenebaum. Greenebaum approved of this solution and, on November 14, 1974 mailed a letter to Pioneer informing it of the agreement and asking Pioneer to "formally indicate your concurrence in the appropriate space on a copy of this letter and return such copy, as executed, to me." (Exhibit A–12) The letter was sent to Pioneer Vice President Patrick Galvin by attorney Kenneth M. Robins. Mr. Galvin, after meeting with Mr. Robins, executed and returned a

copy of the letter on December 11, 1974. Subsequently, Greenebaum exchanged its construction loan agreement note for the fee title to the realty.

By accepting the fee title from Hill Pond, Greenebaum prevented Pioneer from purchasing the lender's note in the event of default on the construction—an option given to Pioneer in paragraph thirteen of the C.D.E. It is Pioneer's contention that by this action, Greenebaum breached the terms of the C.D.E., waived any rights under the document, and thereby relieved Pioneer of any obligations.

II

Kenneth M. Robins is a member of the Denver law firm of Brownstein, Hyatt, Farber and Madden. In the summer of 1973 Mr. Robins was consulted by Greenebaum concerning the drafting of the Greenebaum-Hill Pond loan commitment agreement. (Robins deposition at 15).[2] Mr. Robins' work on the Hill Pond documents continued until September of 1973. (Deposition at 34) Attorney Robins did no further work on the project until the end of May, 1974. (Deposition at 34) It was at this time that the parties allege that the project was seriously "out of balance." Mr. Robins was contacted by someone in the Greenebaum home-office in Chicago, presumably because of the problems with Hill Pond, including the cost overruns associated with the project. (Deposition at 36) During the May-June period Mr. Robins contacted representatives of Pioneer, including Vice President Galvin, to discuss the Hill Pond problem and other construction projects in which Plaintiff and Defendant were cooperating. (Deposition at 44–45) During September and October, discussions were held within the Greenebaum organization in an attempt to devise an "internal" resolution of the situation. (Deposition at 55–56)

In mid-October, Robins participated in negotiations between Greenebaum and Hill Pond wherein some accommodation was to be arranged concerning the outstanding

2. Unless otherwise noted, all deposition references are to the Deposition of Kenneth Michael Robins, taken on December 9, 1975 in Denver, Colorado.

promissory note, which by that time was clearly in default. For many months prior to this negotiation, Mr. Robins attempted to arrange the refinancing of the mortgage with a third-party (Deposition at 51–55), but those attempts proved unsuccessful. In the October Hill Pond negotiations the transfer of the fee title was discussed and it was Mr. Robins' opinion that before such an exchange should take place, Pioneer should be contacted. (Deposition at 76–77) Certain contacts were made with Pioneer, particularly with Patrick Galvin. Telephone conversations and letters were exchanged on and around November 11 and November 14 (Deposition at 81); face-to-face meetings were had in Los Angeles on November 27 (Deposition at 87–88); Mr. Galvin returned the executed letter mentioned above on December 11; telephone conversations were attempted on December 15 (Deposition at 99); and finally a formal letter was mailed to Pioneer on December 26 (Deposition, *id.*). While this itemization is not totally complete, it does convey the intensity of negotiations that were carried on between Greenebaum and Pioneer on the subject of the transfer of the 98 acre fee title.[3] The exchanges listed all involved attorney Robins and all have a bearing on the intent of the parties concerning the disputed "formal concurrence" by Pioneer to the surrender of the Hill Pond fee.

Finally, we note that this litigation was commenced on May 23, 1975 and has been hard fought at every step. The "designation of record" for this motion alone contains nearly one thousand pages which the Court has reviewed. The cross-motions for summary judgment contained documentation which went well into the hundreds of pages. The factual issues, as well as certain legal issues upon which we do not comment at this time, are complex and require the devoted attention of any counsel who go forward with the case. In monetary terms the stakes are high; and while the Court has not yet focused on the issues,

the pleadings indicate that the recovery, if any, could rise to millions of dollars.

## CONCLUSIONS OF LAW

The granting of a motion to disqualify counsel is a matter addressed to the sound discretion of the trial court. *Hull v. Celanese Corp.,* 513 F.2d 568 (2d Cir. 1975); *Cinema 5, Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2d Cir. 1976). Defendant Pioneer brings its motion under Canon 5 of the Code of Professional Responsibility as adopted by the Colorado Supreme Court, effective August 20, 1970.

Initially we note that there exists no statutory obligation upon the federal courts to apply the Code as enacted by any state jurisdiction or as adopted by the American Bar Association. *International Electronics Corp. v. Flanzer,* 527 F.2d 1288, 1293 (2d Cir. 1975). The Code, however, does set guidelines for the professional conduct of attorneys appearing before the federal bar. *Hull v. Celanese Corp., supra; Cinema 5, Ltd. v. Cinerama, Inc., supra.* In *United States v. Springer,* 460 F.2d 1344, 1354 (7th Cir. 1972), the court observed that the application of the Code of Professional Responsibility is a part of the court's general supervisory authority to ensure fairness to all who bring their cause to the judiciary for resolution. We shall apply the Code in that spirit of fairness.

### I

The disciplinary rule to which Defendant refers in its motion is DR 5–102(A), which reads in part:

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial . . . .

Certain exceptions to the rule are contained in DR 5–101(B). They are:

---

**3.** Discussions between Mr. Robins and Mr. Galvin continued well into 1975; *e. g., see* Deposition at 130–38.

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality. . . .

(3) If the testimony will relate solely to the nature and value of legal services rendered in a case. . . .

(4) As to any matter, if refusal to continue representation would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

Although Plaintiff's counsel dispute the matter, it is obvious that exceptions (1), (2) and (3) do not apply to the facts of this case. Testimony of attorney Robins is important on more than a simple formal matter, and his testimony is anticipated to be severely contested.

As to the fourth exception, it seems clear that there would be some hardship on Plaintiff if its corporate counsel of longstanding could not prosecute the case. One reason for maintaining a continuing relationship with a lawyer or law firm is to prevent the difficulty which would ensue if each time litigation was commenced a new attorney would be required to familiarize himself with the client and its business. The advantages of preventive law, like preventive medicine, is well recognized through this profession as a means of settling business problems before they require expensive and time-consuming litigation. A client who desires to head off a court battle should not be penalized for having the foresight to employ legal counsel before the commencement of a lawsuit. Requiring a litigant to change counsel when a suit is filed surely causes some degree of hardship. Such hardship would be even more evident in a case such as this, which has been hard-fought and the pleadings voluminous. This reality is especially relevant here, where the motion to disqualify was not filed until nearly fourteen months after the Complaint was filed.

Nonetheless, it was clear from the beginning that Mr. Robins would play some part as a witness in the event that this controversy ended, as it has, before a court. The fact that the attorneys have been slow to recognize that which is their duty to recognize, *i. e.,* the Disciplinary Rules, should not be the sole factor which is determinative in a finding of "substantial hardship." If it were determinative, the rule could be circumvented by an attorney remaining mute in the face of the rule, all the while hoping that his adversary would not recognize the problem until the case were well under way. This factor must also be recognized in our deliberations.

But just as the court should prevent such a tactic when used, so should the court recognize that a motion to dismiss opposing counsel itself can be used as an unfair trial tactic. Circuit Judge Gurfein has warned, in *J. P. Foley & Co. v. Vanderbilt,* 523 F.2d 1357, 1360 (2d Cir. 1975), " . . . the attempt by an opposing party to disqualify the other side's lawyer must be viewed as part of the tactics of an adversary proceeding. As such it demands judicial scrutiny to prevent *literalism* from possibly overcoming substantial justice to the parties." (emphasis added)

Defendants point to the literal reading of DR 5–102 and ask this court to disqualify Mr. Robins and his entire law firm. Rather than follow this suggestion, we believe it better to explore the rationale of the disciplinary rule and apply the rule in a manner which would serve the interests of justice.

In accepting this approach, we are buttressed by the position of the Committee on Professional Ethics of the American Bar Association. In their informal opinion No. 339 (November 16, 1974) the Committee pointed out that DR 5–101(B) and DR 5–102(A) are not *per se* rules which require a literal reading, but that their application necessarily depends "upon the attending facts" in each case. The Connecticut Bar Association has taken a similar view of Canon 5. In its *amicus* brief in the *International Electronics* case, *supra,* the Bar Association commented:

It behooves this court, therefore, while mindful of the existing Code, to examine afresh the problems sought to be met by

that Code, to weigh for itself what those problems are, how real in the practical world they are in fact, and whether a mechanical and didactic application of the Code to all situations automatically might not be productive of more harm than good, by requiring the client and the judicial system to sacrifice more than the value of the presumed benefits.

A critical question then, is not whether a lawyer who has some relationship to the prosecution of a trial may appear as a witness in that trial, but whether the litigation can be conducted in fairness to all, with all parties properly represented, if the attorney testifies. *Wolk v. Wolk,* 70 Misc.2d 620, 333 N.Y.S.2d 942 (Sup.Ct.1972). Sanctions should not be imposed, especially the sanction of complete disqualification of a law firm, unless the claimed misconduct in some manner *taints* the underlying trial or the legal system. *See W. T. Grant Company v. Haines,* 531 F.2d 671, 677 (2d Cir. 1976).

## II

To determine the manner in which the trial, or the legal system itself, could be tainted, we must explore the arguments which have been put forth in support of the doctrine embodied in DR 5–101 and 5–102.

Professor Wigmore has discussed in some detail the arguments advanced against an attorney testifying as a witness in his own case. 6 *Wigmore on Evidence* § 1911 (1940 ed.). The first theory is the now discredited "disqualification by interest." No litigant in a modern American court, however, would seek to dredge up that proposal, for his own client would be barred from testifying for fear that he might distort the truth in his quest for success at trial.

The second argument concerns the "dangerous effects of the practice upon the public mind." This position advances the thought not that a lawyer will distort the truth, but that the public will *think* that the lawyer will distort the truth. Professor Wigmore considers this the most persuasive argument against the lawyer both prosecuting the suit and testifying in it. While the

argument might have some efficacy in a case where all that is attempted is disqualification of the attorney who is a witness, it loses some of its force when the rule is applied to the attorney's entire law firm. Canon 6 requires that a lawyer represent his client completely. It would be unfortunate to think that a firm would represent a client with more diligence, or represent a client to a degree that distorts the truth, simply because a member of the law firm is to testify in the case. The firm sought to be disqualified has demonstrated the same competence and professionalism in all court matters relating to this litigation and in other non-related matters. This Court is satisfied that the members of this law firm will represent a client with the same thoroughness and competence regardless whether one of its associates testifies in the case. The Court is likewise satisfied that those same attorneys will stay within the limits of ethical propriety, even when an associate is a witness. We have discovered no evidence to the contrary. In any event, it has been observed that "almost every party to a civil lawsuit (and his agents) is suspect of stretching the truth for his own cause." *International Electronics, supra* at 1294.

Additionally, if the main consideration is shifted to the public perception of the situation, one should be cognizant of the caveat of the Second Circuit in the *International Electronics* case:

> When we deal with what the public thinks, we must be careful not to accept the view of the most cynical as the true voice of the public, lest we accept a lack of faith in our institutions as a categorical basis for restricting otherwise ethical conduct.

While the public view (if indeed it is the public view rather than merely theories of attorneys) has some sense of reality when it considers a lawyer who conducts the case as having reason to stretch the truth when he testifies in the case, we believe any such public view would be less ardent when disqualification was directed at the entire law firm involved.

Professor Wigmore's final comment against the attorney as witness is the fear that the statements of counsel in closing arguments might bear too much weight with the jury, since the jury previously observed the attorney taking an oath to tell only the truth. This is somewhat the converse of the previous argument. There, the lawyer was suspect of stretching the truth when under oath and testifying; here, the lawyer is thought to be the paragon of truth when not testifying. Regardless of the consistency of the arguments, the later problem is simply not relevant here. Because this case involves a trial to the court, rather than to a jury, we are confident that the finder of fact can make the necessary distinctions.

An additional factor not mentioned by Wigmore is the prejudice to the attorney's adversary. Opposing counsel might be hesitant to cross-examine a brother of the bar quite as harshly as he would a lay witness. We believe, however, that the duty of an attorney to his client, to represent the client completely and zealously as required by Canons 6 and 7, easily outweighs and overcomes any professional loyalty.

### III

■ The Court has considered all the factors discussed above in its deliberation in this matter. We recognize that the mute attorney can use such a factual situation as this to his advantage. We also recognize that counsel can approach the Code and Canon 5 as another arrow in his quiver of trial tactics. We believe that the main purpose of Canon 5 is "to avoid prejudice at trial." *See Molded Plastic Box Co v. Precision Polymers, Inc.,* Unpublished, 73 Civil 3939 (S.D.N.Y., Dec. 3, 1974). In our review, we have attempted a resolution that avoids, as much as possible, prejudice to all parties in this case.

As clients realize, the cost of litigation in even a suit of relatively small monetary consequences is not a matter of pride to the legal system. Costs in a large lawsuit such as this can become enormous. Nearly fourteen months have passed between the filing of the Complaint and the initiation of the motion to disqualify. During the interim the case has not lain dormant. The Court's file reflects the complexity of the case and it is only logical that the respective attorneys' files contain many times the material of our own. We also note that the motion to disqualify was itself included as part of a voluminous cross-motion for summary judgment, and was sought in the event that the Court denied summary judgment. As such, the timing of the motion hardly speaks for its *bona fides.*

While not part of the motion itself, Defendant has invoked Canon 9, that a lawyer "SHOULD AVOID EVEN THE APPEARANCE OF PROFESSIONAL IMPROPRIETY," and Disciplinary Rule 5–102(B), which speaks in terms of withdrawal when it becomes apparent that a lawyer's testimony may be prejudicial to his client. In response, Plaintiff has tendered the affidavit of Earl S. Belofsky, Chairman of the Board of Greenebaum Mortgage Company and President of Greenebaum-Mountain Mortgage Company.[4] (Plaintiff's Exhibit 1 and Exhibit 1–a) Mr. Belofsky states that he is familiar with the papers filed in this lawsuit and the role that attorney Robins plays in the issues of this action. Mr. Belofsky indicated that Greenebaum "desires the Law Firm to continue its representation in this lawsuit regardless of the involvement of Kenneth M. Robins." (Plaintiff's Exhibit 1 at 4.) In light of the informed judgment of the client, the Court sees no difficulties in relation to Canon 9 or DR 5–102(B) in the law firm's continued participation in the suit.

In fairness to all parties, and to the judicial system, we believe that *in this case* the trial will not be tainted by allowing Mr. Robins' firm, rather than Mr. Robins himself, to conduct the future course of this litigation. The rationale behind Canon 5, as

---

4. Greenebaum-Mountain Mortgage Company is a subsidiary of Greenebaum Mortgage Company. While the entities are distinct, for the limited purposes of this Order only, they have been treated as a single enterprise.

applied to the facts of *this* litigation, do not persuade the Court that justice and common sense require disqualification of the entire firm.

Had this motion arisen under Canon 4 of the Code, dealing with the maintenance of confidences and secrets of a client, the Court might be disposed to take a different position. In this case, however, disqualification of Mr. Robins alone is sufficient to maintain professional propriety and the intent of the Code of Professional Responsibility.

### ORDER

ACCORDINGLY, IT IS HEREBY ORDERED that Defendant's Motion for Withdrawal of Plaintiff's Counsel, filed on July 7, 1976, is granted to the extent that Kenneth M. Robins, Esquire, shall no longer participate, as an attorney in the practice of his profession, in the further litigation of this lawsuit.

IT IS FURTHER ORDERED that Defendant's Motion for Withdrawal of Plaintiff's Counsel is denied to the extent that it seeks to disqualify the law firm of Brownstein, Hyatt, Farber and Madden from further participation in this lawsuit.

The Court underscores the fact that this Order is not entered due to any professional or personal impropriety on the part of Kenneth M. Robins.

This Order constitutes Findings of Fact and Conclusions of Law as required by *Fullmer v. Harper,* 517 F.2d 20 (10th Cir. 1975).