**In the Matter of Maurice Louis BRAVERMAN, Appellant,**

**National Lawyers Guild, Amicus Curiae.**

**No. 75–1910.**

United States Court of Appeals, Fourth Circuit.

Argued April 9, 1976.

Decided Nov. 9, 1976.

C. Christopher Brown, Baltimore, Md. (Michael Millemann, Stanley Mazaroff, Venable, Baetjer & Howard and Harold P. Dwin, Baltimore, Md., on brief), for appellant.

Doron Weinberg, President, National Lawyers Guild, Joseph Forer and David Rein, Washington, D. C., for National Lawyers Guild on brief as amicus curiae.

Before CRAVEN and WIDENER, Circuit Judges, and HADEN,* District Judge.

CRAVEN, Circuit Judge:

In 1952 Lawyer Maurice L. Braverman was convicted of participation in a Communist conspiracy in violation of Section 2 of

* Charles H. Haden, II, sitting by designation.

the Smith Act, 18 U.S.C. § 2385. As a result of his conviction, he was barred from practice in both state and federal courts in Maryland. *Braverman v. Bar Assoc. of Baltimore City,* 209 Md. 328, 121 A.2d 473 (1955); *In re Braverman,* 148 F.Supp. 56 (D.Md.1957). Nearly 19 years later, on March 1, 1974, the Maryland Court of Appeals granted Braverman's petition to be reinstated as a member of the bar of Maryland, *In re Braverman,* 271 Md. 196, 316 A.2d 246 (1974). His identical petition for reinstatement to the bar of the United States District Court for the District of Maryland, however, was denied, *In re Braverman,* 399 F.Supp. 801 (D.Md.1975).[1] Because the reasons assigned by the district court for declining reinstatement are without evidentiary support, and in the interest of symmetry in the standards of qualification of coordinate courts in the same state, we reverse and remand with instructions that Mr. Braverman be reinstated to the bar of the Maryland District Court.

## I.

Braverman was first admitted to the Maryland bar in 1941 and practiced law in Baltimore for 11 years. During this time he became involved with the Communist Party, U.S.A. The details of his participation in Communist Party affairs are set forth in the opinion of this court affirming his Smith Act conviction, *Frankfeld v. United States,* 198 F.2d 679, 686 (4th Cir. 1952):

> Defendant Braverman had served as a member of the District Committee of the party, had been a candidate for chairman at one of its meetings, had served as its attorney, was a member of its "white collar club" and had conducted classes for it in his home.

Braverman was sentenced to three years in prison and fined $1,000 for his involvement in a conspiracy to teach, advocate and organize the overthrow of the government by force and violence in violation of the Smith Act. He paid his fine and served 28 months in prison.

After release, Braverman severed his ties with the Communist Party and, in order to support his wife and two children, embarked upon a new career as a bookkeeper for small businessmen. By the 1960's, he had resumed an active role in neighborhood politics. In 1969 he was elected an officer of the Fifth District New Democratic Coalition, a political club which included as members several Maryland state legislators. In the 1970's Braverman served as president of St. John's Council on Criminal Justice, an association concerned with correctional and criminal justice. His record and conduct have been in every way exemplary.

Braverman's effort to regain the right to practice law was strongly supported by numerous letters of endorsement from members of the Maryland bar, state legislators, doctors, professors, clergymen and other persons of distinction. Fifty of his neighbors endorsed a petition asking that he be reinstated. After conducting an independent investigation, the Maryland State Bar Association unequivocally recommended to the Maryland Court of Appeals that Braverman be readmitted to practice law in that state. The state bar has reiterated its position with regard to Braverman's current attempt to obtain reinstatement to the federal bar. No contrary testimony or evidence was forthcoming, and no opposition to Braverman's reinstatement has been expressed.

Braverman's petition for reinstatement was referred to a panel of three Maryland judges. The Bar Association of Baltimore represented to the panel that "there has not been a scintilla of evidence presented to the executive council of the Bar Association of anything derogatory about Mr. Braverman . . . and [we have] no information

---

1. The vote to deny reinstatement was 6–3. We note, however, that two judges voting with the majority had assumed senior status at the time the decision was made. Subtraction of the two votes would still leave a 4–3 majority against reinstatement, and so we need not decide whether the senior judges are qualified to sit. Cf. *Moody v. Albemarle Paper Co.,* 417 U.S. 622, 94 S.Ct. 2513, 41 L.Ed.2d 358 (1974).

that is contradictory to what [those persons testifying and writing letters on Braverman's behalf] state about his character and his honesty and his trustworthiness since his release from prison and during the period subsequent to his release." The panel recommended that Braverman be reinstated, concluding that he had proven "by clear and convincing proof his fitness to practice law."

During the evidentiary hearing before the three-judge state panel, Braverman conceded that his conviction for violation of the Smith Act was final, but insisted, as he always has, that he lacked the *personal* intent to use force and violence to overthrow the government of the United States. Consistent with that position, he has never expressed penitence and contrition. The panel remarked:

> [The] intellectual honesty of his position must be recognized. . . . We believe petitioner has demonstrated his reformation without an expression of contrition from him. Starting from the premise that his guilt was conclusively proven, we find his conduct since conviction to be a complete turnabout from that which resulted in his conviction. . . .
> We believe this constitutes reformation as this term is used in the present proceedings.

Regarding Braverman's moral character, the state court panel found that "the impressive and unchallenged evidence presented by the petitioner of his present good character clearly established his eligibility for reinstatement on this score."

The Maryland Court of Appeals accepted the recommendation of the special panel, and ordered Braverman reinstated to the Maryland bar.

**II.**

What had transpired in the state court was virtually repeated in the United States District Court hearing. The majority, concurring, and dissenting opinions in the district court, *supra*, 399 F.Supp. 801, simplify our task considerably. We put to one side, as did the district court, all questions having to do with Braverman's guilt. It is enough that he was convicted and his conviction affirmed, and he himself concedes that conviction is final, unappealable, and no longer subject to collateral attack. Therefore it matters not whether under a higher burden of proof put upon the government by a later Supreme Court decision there might have resulted an acquittal.[2] Nor need we decide anew whether conviction of a violation of the Smith Act involved moral turpitude for the simple reason that Braverman does not attack the validity of his disbarment, but instead insists only that he is entitled to reinstatement. Finally, we need not decide what went on in Braverman's mind in the 1950's when he was a member of the Communist Party, and specifically whether he believed in the use of force and violence to overthrow the government of the United States. It does not matter, because the district court, although put off by Braverman's continuing insistence upon his innocence, did not rest its refusal to reinstate upon the ground that Braverman was lacking in contrition. Instead the court seemed to recognize, as did the Maryland Court of Appeals, that *mea culpa* is not a part of our criminal law, and that there is always a theoretical possibility of innocence despite any guilty verdict.

It is perfectly clear that Braverman was denied reinstatement for one reason only: in colloquy with the hearing panel he

---

**2.** The Maryland Court of Appeals remarked that "serious question exists whether the evidence adduced against Braverman, apparently adequate to sustain his conviction under *Dennis* [*v. United States,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)], would have been legally sufficient to support his conviction under the standards laid down in *Yates* [*v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356

(1957)] and *Scales* [*v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961)]."

The National Lawyers Guild, in its brief *amicus curiae,* argues that Braverman should be reinstated on grounds that his original disbarment resulted from an unconstitutional Smith Act conviction. We need not reach the question, as it is not urged upon us by Mr. Braverman.

was thought to have dissembled with intent to mislead the panel. We agree with the district court that one who has been disbarred has the duty to be truthful in proceedings seeking reinstatement, and that a failure to be truthful would support a conclusion that the applicant has not been sufficiently rehabilitated to deserve reinstatement as a member of the bar.[3]

■ The district court based its conclusion of lack of candor on a colloquy in open court and a published interview with Braverman.[4] The pertinent colloquy is set out in the margin.[5] The conversation begins with a statement by Judge Thomsen to the effect that the Marxists and Lenin advocated *force and violence for the overthrow of capitalist governments* and ended with a question: "Didn't he say that it couldn't be accomplished *otherwise*?" (Emphasis added.) Note that Braverman was not asked to respond to the judge's statement that Lenin advocated force and violence. He answered the only question propounded,

and said that Lenin and other Marxists did not *exclude* peaceful means of Communist expansion.

His viewpoint is not without support. It is true that in one of his works Lenin said, "The substitution of a proletarian for a capitalist state is impossible without violent revolution." But as the Supreme Court noted in *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943), Lenin and other Marxists said more than that:

The Manifesto of 1848 was proclaimed in an autocratic Europe engaged in suppressing the abortive liberal revolutions of that year. With this background, its tone is not surprising. Its authors later stated, however, that there were certain countries, "such as the United States and England in which the workers may hope to secure their ends by peaceful means." Lenin doubted this in his militant work, The State and Revolution, but this was written on the eve of the Bolshevist revo-

---

**3.** It should be noted that the disciplinary panel of the district court was convened to hear Braverman's plea for readmission and to apply the rehabilitation standard in determining the question. The applicant was not notified that he would be examined anew as to his former membership in the American Communist Party, nor was he warned that a correct understanding of Communist dogma would be viewed as critical to the question of rehabilitation. It is self-evident, of course, that admission to the bar does not depend upon conformity of opinion to that held by a majority of the court. Just the other day, Mr. Justice Stevens had occasion to again quote Voltaire:

A remark attributed to Voltaire characterizes our zealous adherence to the principle that the Government may not tell the citizen what he may or may not say. Referring to a suggestion that the violent overthrow of tyranny might be legitimate, he said: "I disapprove of what you say, but I will defend to the death your right to say it." The essence of that comment has been repeated time after time in our decisions invalidating attempts by the Government to impose selective controls upon the dissemination of ideas.

*Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 63, 96 S.Ct. 2440, 2449, 49 L.Ed.2d 310 (1976).

**4.** *A Meeting with Maurice Braverman,* 4 Md. Law Forum 93 (1974).

**5.** JUDGE THOMSEN: Well, didn't the Marxist classics, let's say Mr. Lenin, I suppose, is one of the classics . . . he certainly had an abundance of evidence in his books that he was advocating force and violence for the overthrow. Didn't he say that it couldn't be accomplished otherwise?

MR. BRAVERMAN: Your Honor, that was never my understanding. I can only tell you that I followed very carefully the discussion of the Marx and Lenin works in the *Schneiderman* case before I joined the Communist Party. Now, I've never read all the Marx and Lenin works; they'd take up a very large library. I read some things . . . but I never came across where force and violence, as a way of achieving change, was ever heard. There has been some discussion of that. I'd be glad to talk to the Court about what my understanding of it was at that time. But, there was never any understanding that I, or anybody else, belonged to a conspiracy or believed in it. As a matter of fact, one of the things in the constitution of the Communist Party was a statement that belief in force and violence was incompatible with membership in the Communist Party . . . and if someone had been found advocating force and violence, he would be expelled from the Communist Party. This was my understanding and my belief.

lution in Russia and may be interpreted as intended in part to justify the Bolshevist course and refute the anarchists and social democrats. Stalin declared that Marx's exemption for the United States and England was no longer valid. He wrote, however, that "the proposition that the prestige of the Party can be built upon violence . . . is absurd and absolutely incompatible with Leninism." And Lenin wrote "In order to obtain the power of the state the class conscious workers must win the majority to their side. As long as no violence is used against the masses, there is no other road to power. We are not Blanquists, we are not in favor of the seizure of power by a minority."

*Schneiderman v. United States,* 320 U.S. 118, 155–56, 63 S.Ct. 1333, 1351 87 L.Ed. 1796 (1943). Certainly what Lenin believed is a matter not so clear that either we or the district court could judicially notice the correct answer to Judge Thomsen's question.[6]

But before Braverman got through with his answer, he said, "but I never came across where force and violence, as a way of achieving change, was ever *heard.*" (Emphasis added.) He had begun that same sentence with the words, "I read some things . . . but . . . ." It is possible to interpret the sentence elliptically to mean, "I have read about force and violence as a teaching of the Communist Party, but I never personally heard it in my own cell." Such an interpretation is entirely consistent with Braverman's last two sentences refer-

ring to the American Communist Party Constitution and its rejection of force and violence as an instrument of change. He was right about that.[7]

The district court interpreted the same colloquy as follows:

Asked by a member of our panel whether Lenin did not advocate the use of force and violence, Braverman answered that he had followed very carefully the discussion of the works of Marx and Lenin in the *Schneiderman* case before he joined the Communist Party; that he had read some but not all of their works, and that he "never came across force and violence as a way of achieving a change."

399 F.Supp. at 803–04. The comparison with the actual colloquy set out in the margin discloses plain error. Braverman was not even asked whether Lenin advocated force and violence. Instead, he was asked whether Lenin had said that the advance of communism could not be accomplished *otherwise.* Thus the conclusion that Braverman answered untruthfully is without factual support.

The other finding of fact upon which the district court premised its conclusion that Braverman had intended to mislead the panel had to do with Braverman's interpretation of *Schneiderman v. United States,* 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943). The district court found that in a published speech made at the law school of the University of Maryland, which speech was called to his attention during the hearing before the panel, Braverman had said, "And, as a matter of fact, it was because I

---

**6.** Perhaps, at most, Fed.R.Evid. 201 would permit our judicially noticing that the complete works of Marx and Lenin would "take up a very large library," as Braverman remarked to the court at one point.

**7.** Art. 9, § 2 of the 1945 Communist Party Constitution provides:

Adherence to or participation in the activities of any clique, group, circle, faction or party which conspires or acts to subvert, undermine, weaken or overthrow any or all institutions of American democracy, whereby the majority of the American people can maintain their right to determine their desti-

nies in any degree, shall be punished by immediate expulsion.

This section was revised by the 1948 amendment to read as follows (Art. VIII, § 3):

Any member shall be expelled from the Party who is found to be a strikebreaker, provocateur, engaged in espionage, or who advocates force and violence or terrorism, or who adheres to or participates in the activities of any group or party which conspires or acts to subvert, undermine, weaken or overthrow any or all institutions of American democracy through which the majority of the American people can maintain their right to determine their destinies.

was assured by the Supreme Court in the *Schneiderman* case that the Communist Party did not believe in force and violence that I joined the Communist Party." [8] But again the district court quoted Braverman out of context. The full quotation is set out in the margin.[9]

In the oral interview, Mr. Braverman attempted to capsule the *Schneiderman* decision three times. As printed in the lawyers edition of the United States Supreme Court Reports, *Schneiderman* begins on page 118 of 320 U.S., on page 1333 of 63 S.Ct., on page 1796 of 87 L.Ed. and, including the dissenting opinion and an appendix, ends on page 207 of 320 U.S., on page 1345 of 63 S.Ct., on page 1846 of 87 L.Ed. It is not easy to state in one sentence what a 50-page opinion of the United States Supreme Court holds. Mr. Braverman, we think, did

it about as well as anyone could twice, and argumentatively a third time. *See* the italicized portions of the excerpt set out in footnote 9. We think it fair to say that *Schneiderman* does stand for the proposition, as Mr. Braverman said, that taking the oath of allegiance to the United States and being a member of the Communist Party are not incompatible. His statement that *Schneiderman* held that the Communist Party did not necessarily believe in the principle of force and violence is also substantially correct, although it would be more accurate to say that the Court held the government had failed to prove that the Party adhered to such principles. It seems to us that Mr. Braverman went a bit far in saying that he was assured by the Supreme Court in *Schneiderman* that the Communist Party did not believe in force and violence.

8. 4 Md. Law Forum, *supra,* at 99.

9. The whole issue in my case was that this was not a crime involving moral turpitude, but was rather a political crime—and of course the court wouldn't recognize the concept of political crime. Now I could tell you how much moral turpitude was involved in my particular crime. *In 1943, the Supreme Court decided the Schneiderman case and they held that the Communist Party did not necessarily believe in the principles of force and violence.* This case involved Schneiderman, a Communist on the West Coast, and is a very interesting case. It discusses Marxism and Leninism, and it discusses the old classics, the same books that were used in the trial against me. *And, as a matter of fact, it was because I was assured by the Supreme Court in the Schneiderman case that the Communist Party did not believe in force and violence that I joined the Communist Party.* In 1951, on the same books and virtually the same evidence, the Supreme Court upheld the conviction of Dennis and the other Communist leaders in New York for being part of a conspiracy to teach and advocate force and violence. In 1957, in *Yates* [*Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356], they said that the evidence used against us should never have gone to the jury; and virtually throughout the *Dennis* [*Dennis v. United States,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137] decision period there were never any more arrests with trials. I ask you, how much moral turpitude is involved in a crime which was a crime *only* [original emphasis] between the years of 1951 to 1957?

Q: What is your attitude toward the Communist Party now?

Mr. Braverman: Well, I like to think that I haven't changed. I still believe in and want social justice and economic justice. I don't think that the Communist Party is a good vehicle for me to find those changes. It may be for someone else, but I really could not discuss whether I'm right or wrong, because I don't know that much about the Communist Party today. I left a long time ago, and I made, when I left, what I thought was the right decision then.

Q: You said it was in reading *Schneiderman* that you decided that you could take the job of counsel for the Communist Party without really fearing for your career. If the *Dennis* case would have been the *Schneiderman* case, would you have taken the job as counsel?

Mr. Braverman: Well, I would still have taken the job as counsel. I probably would not have joined the Communist Party. I'm not a martyr, and although I think that *Dennis* was bad law, I might have tried to change *Dennis* before I would have joined the Communist Party. *Dennis* was bad law, but the *Schneiderman* case had to do with the oath that a man, a person, takes when he becomes a naturalized citizen. And the oath is the same oath that one takes when one becomes a lawyer. *And the Schneiderman case decided that taking the oath and being a member of the Communist Party were not incompatible with each other.* But *Dennis* was a terribly bad decision, and I was glad that it was finally . . . it was never specifically overruled, but I'm glad that it was finally limited to oblivion. (Emphasis added.)

But we are not prepared to say that one of his biases could not have found such assurance in a decision clearly holding that an American citizen can be loyal to the Constitution and at the same time a member of the Communist Party. Since *Schneiderman* made membership in the Communist Party legitimate for Americans, and since the Court has always set its face against the violent overthrow of the United States, it is not wholly untenable to attribute to the Court, although it did not say so,[10] belief that the Communist Party did not believe in force and violence as a means of seeking power.

But more importantly, it seems to us that a readmitted member of the Maryland Bar should not be denied admission to a federal court because he exaggerates Supreme Court doctrine in conversation that also in-

cludes two reasonably accurate statements of what the Court held. We are semanticists, and it is a part of our profession to embellish, interpolate, and even speculate as to what a decision truly means. Argument and discussion would be pretty sterile if limited to the actual words spoken by the Court.

### III.

Admission to practice in the United States District Court for the District of Maryland is predicated upon good standing in the bar of any court of the United States *or of the highest court of any state* and possession of good private and professional character. Reinstatement after disbarment is judged by one standard only—that the motion set forth facts showing good cause why readmission should be granted and that the movant is rehabilitated.[11] The dis-

---

**10.** The Court noted that it had never passed upon whether force and violence is a Party principle, and stated that it was "unnecessary for us to do so now." 320 U.S. at 148, 63 S.Ct. at 1347. But the Court said, *inter alia*:

None of [Schneiderman's Communist beliefs are] necessarily incompatible with the "general political philosophy" of the Constitution

. . . . .

320 U.S. at 141, 63 S.Ct. at 1344.

It does not appear that [a dictatorship of the proletariat] would necessarily mean the end of representative government or the federal system.

*Id.* at 142, 63 S.Ct. at 1345.

Our concern is with the extent of the allowable area of thought under the statute. We decide only that it is possible to advocate such changes [Communism] and still be attached to the Constitution within the meaning of the Government's minimum test.

*Id.* at 144, 63 S.Ct. at 1346.

[N]one of the foregoing principles, which might be held to stand forth with sufficient clarity to be imputed to petitioner on the basis of his membership and activity in the League and the Party and his testimony that he subscribed to the principles of those organizations, is enough, whatever our opinion as to their merits, to prove that he was necessarily not attached to the Constitution when he was naturalized.

*Id.* at 146, 63 S.Ct. at 1346.

A tenable conclusion from the foregoing is that the Party in 1927 desired to achieve its purpose by peaceful and democratic means, and as a theoretical matter justified the use of force and violence only as a method of preventing an attempted forcible counter-

overthrow once the Party had obtained control in a peaceful manner, or as a method of last resort to enforce the majority will if at some indefinite future time because of peculiar circumstances constitutional or peaceful channels were no longer open.

*Id.* at 157, 63 S.Ct. at 1352.

**11.** The following local rules for the United States District Court for the District of Maryland are material to the disposition of this case:

*Rule 2*
*Admission to Practice*

It shall be requisite for the admission for any person to practice in this Court that such person shall make written application and be sponsored by a member of the bar of this Court and shall satisfy the Court that he or she is a citizen of the United States and a member in good standing of the bar of any Court of the United States, or of the highest court of any State, and that his or her private and professional character is good.

*Rule 2A*
*Disciplinary Action*

(F) Except under extraordinary circumstances, an attorney who has been disbarred by this court shall not be eligible for readmission. An attorney who has been suspended and who desires to be readmitted to practice before this court shall file a motion setting forth facts showing good cause why readmission should be granted. The motion shall set forth facts showing that the movant is rehabilitated and is otherwise entitled to the relief sought. The Disciplinary Committee may direct that copies of the motion shall be sent to any person who filed the original charges

trict court referred to the readmission procedures in the Maryland Court of Appeals and did not question that facts had been presented showing good cause why readmission should be granted. It could scarcely have done otherwise in view of the findings of the Maryland Court of Appeals, recited hereinabove. *In re Braverman,* 271 Md. 196, 316 A.2d 246 (1974).

Thus the only question remaining was whether Braverman had been rehabilitated. Although concerned with his failure to express penitence, as we have previously noted, the district court, perhaps persuaded by the viewpoint of the Maryland Court of Appeals, did not refuse readmission on that ground. As we read the majority opinion,[12] Braverman was denied readmission solely because he made statements to the panel of the court "either recklessly or with intent to mislead the panel." 399 F.Supp. at 807. For the reasons stated hereinabove, we conclude that there is not substantial evidence to support the ultimate finding upon which readmission was denied.

The issue before us is similar to that decided in *Konigsberg v. State Bar of California,* 353 U.S. 252, 77 S.Ct. 722, 1 L.Ed.2d 810 (1957):

Does the evidence in the record support any reasonable doubts about [Braverman's] good character or his loyalty to the Governments of State or Nation?

353 U.S. at 262, 77 S.Ct. at 727. In answering that issue in favor of the applicant, the Supreme Court said that if there is insufficient evidence in the record to support an

adverse finding, "California's refusal to admit him is a denial of due process and of the equal protection of the laws because both arbitrary and discriminatory."

A State can require high standards . . such as good moral character . . . ., but any qualification must have a rational connection with the applicant's fitness . . . to practice law. . . . Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards . . . . .

*Schware v. Board of Bar Examiners,* 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957).

In *In re Isserman,* 345 U.S. 286, 73 S.Ct. 676, 97 L.Ed. 1013 (1953), the Supreme Court, in a plurality opinion, had this to say about the relationship between state and federal bar admission:

Disbarment by a state does not automatically disbar members of our bar, but this Court will, in the absence of some grave reason to the contrary, follow the finding of the state that the character requisite for membership in the bar is lacking.

345 U.S. at 288, 73 S.Ct. at 677.

In *Baird v. State Bar of Arizona,* 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971), the Court said:

The practice of law is not a matter of grace, but of right for one who is qualified by his learning and his moral character.

leading to the suspension and other interested persons or organizations. Thereafter, the Disciplinary Committee may conduct such proceedings as it deems appropriate on the motion and report its findings and recommendations to the judges of this court who shall then make a determination on the motion.

12. In a separate concurring opinion, Judge Miller had this to say about what divided the district court:

The opinion of the Disciplinary Committee [adopted by a majority of the court] differs little from the dissenting opinion of Judge Kaufman [in which Judge Harvey and Judge Young concurred]. The major divergence between the views of the judges of this Court

has *centered about the question of whether Braverman has been rehabilitated* . . . . This, in turn, has required a resolution of the question of whether Braverman has been truthful in his assertion in this Court and elsewhere that he was not aware in the 1940's and early 1950's that the Communist doctrine preached the use of force and violence as an instrument of achieving a change in a system of government.

(Emphasis added.)

Judge Miller fell into the same error made by the majority. Braverman never asserted to the court that he was not aware that Communist doctrine preached the use of force and violence. *See* text, *supra,* Part II.

401 U.S. at 8, 91 S.Ct. at 707. The Court held that where the record is bare of evidence showing moral and professional disqualification it was error to deny admission. The judgment of the Arizona Supreme Court was reversed.

In the case of *In re Dreier,* 258 F.2d 68 (3d Cir. 1958), the district court's refusal of admission to membership in the bar was reversed and remanded by the Court of Appeals. The court had this to say that is especially applicable to *Braverman's* case:

> Under [the rule in this district], and the similar rules in force in most other federal district courts and in the courts of appeals, reliance is largely placed by the court upon the courts of the states for determining the qualifications of persons seeking admission to the bar. . . .
>
> [T]here is no federal procedure for examining applicants either as to legal ability or moral character and so reliance is placed on prior admission to the bar of a state supreme court.

> .     .     .     .     .

> [A]s we have said [the court that tried him] subsequently reinstated him and it was stated at argument in our court that the president judge of that court has certified that the appellant is of good moral character and a member of the bar of that court in good standing.

> Certainly an erring lawyer who has been disciplined and who having paid the penalty has given satisfactory evidence of repentance and has been rehabilitated and restored to his place at the bar by the court which knows him best ought not to have what amounts to an order of permanent disbarment entered against him by a federal court solely on the basis of an earlier criminal record and without regard to his subsequent rehabilitation.

258 F.2d at 69–70.

In the case of *In re Abrams,* 521 F.2d 1094 (3d Cir. 1975), the Third Circuit reversed outright the decision of a district court disbarring an attorney from the practice of law. The state court had imposed a one-year suspension, but the district court had permanently disbarred the applicant.

In striking the appropriate balance, the district courts must not operate in a vacuum. If the disciplinary proceedings derive from state court action, federal courts are not totally free to ignore the original state court proceedings[.]

521 F.2d at 1099–1100.

Judge Rosenn, concurring, said:

> The district court's action permits Abrams to practice in the state, but not the federal, system. Such an anomaly can only lead to confusion in the minds of the public, which justifiably may speculate why an attorney not qualified to practice in a federal court has sufficient moral character to practice in the state court. Unless an exceptional reason of record justifies such disparate treatment, its effect will, in my opinion, render a grave disservice to the public.

521 F.2d at 1106.

The anomaly in *Abrams* and in this case is only compounded when Federal Rules of Appellate Procedure 46 is taken into consideration. The rule reads in part:

> (a) Admission to the Bar of a Court of Appeals; Eligibility; . . . An attorney who has been admitted to practice before the Supreme Court of the United States, *or the highest court of a state,* or another United States court of appeals, or a United States district court . . . and who is of good moral and professional character, is eligible for admission to the bar of a court of appeals.

(Emphasis added.)

Since Braverman has been reinstated by Maryland's highest court, he is eligible for admission to practice in this court if of good moral and professional character.

Because the evidence relied upon by the district court does not support its ultimate finding that Braverman has not been rehabilitated, and because of a proper deference to the considered judgment of the coordinate Maryland Court of Appeals, we reverse and remand with instructions to admit Braverman to practice in the district court.

*REVERSED.*

WIDENER, Circuit Judge (dissenting):

I respectfully dissent, but not without some trepidation for fear of being accused of placing myself other than on the side of the angels and Voltaire as quoted in footnote 3. But if that footnote implies, as I fear it may, that the holding of the district court even remotely suggests that admission to the bar may be dependent upon conformity of opinion to that held by a majority of that court, I specifically disassociate myself from any such implication. I find no such suggestion in the district court's majority, concurring, or dissenting opinions.

I need mention only one aspect of the majority opinion to illustrate my point, and express no opinion on its treatment of Braverman's interpretation of *Schneiderman*. As quoted, Braverman stated at one place "but I never came across where force and violence, as a way of achieving change, was ever *heard*." (Emphasis added by the majority).

By an elliptical interpretation of the sentence, the majority has taken it, especially "*heard*," and twisted both the sentence and the word out of permissible ordinary meanings which the district court was perfectly justified in giving them. A simple illustration will illustrate the error of the majority's way. Suppose a cousin were in Afghanistan, and you were asked "Have you heard from her lately?" A perfectly ordinary meaning would be "Has she written?," but the question might just as well mean "Has she called by telephone, or have you seen anyone from Afghanistan who has knowledge of her?" The majority here, with its construction of the word "*heard*," would say that it would be perfectly truthful to answer that you had not heard from her, although she might have written, because oral communication had not been had. The district judges *heard* this communication orally from Braverman. I think they were entitled to give the sentence the ordinary everyday meaning which they did.

It is difficult to argue with the scholarly dissertation on Communist doctrine, theory, and dogma in the opinion of the majority.

Yet I think such has no place in this opinion to serve as corroboration of Braverman.

The question here is whether Braverman was playing free and loose with the court in his application for reinstatement. The court found as a fact that he was, which may only have reference to Braverman's intent as he made and pursued his application for reinstatement to the bar. It is not new learning that intent is a matter of fact. *United States v. Quincy,* 31 U.S. (6 Pet.) 445, 8 L.Ed. 458 (Jan. term 1832). And the last several generations of lawyers have been at home with the teaching that "the state of a man's mind is as much a fact as the state of his digestion." Lord Justice Bowen in *Edgington v. Fitzmaurice,* 29 Ch.D. 459, 483 (1882). Additionally, I note that even as this dissent is being written, we have reversed a district judge in a criminal case for taking away from a jury, the triers of fact, the question of intent. *United States v. Arthur,* 544 F.2d 730 (4th Cir. 1976).

Especially since the examination was *ore tenus,* the credibility of witnesses and the weight of their evidence is a matter peculiarly within the province of the judges who heard the evidence. Their report has been reinforced by a majority of all the judges on the district court. I do not think the finding that Braverman played free and loose with the court, which is bound to refer to his state of mind, is clearly erroneous. F.R.C.P. 52(a). However much either I or the majority may disagree with the triers of fact, unless they are clearly erroneous, we may not reverse. If the judgment of the district court is to be overturned in this case, it must be done on the theory that the findings are clearly erroneous, which I think may not be predicated, as it is, on giving face value to Communist doctrine, theory, dogma, and paraphernalia, which the whole world knows is observed or not observed by any doctrinaire Communist to achieve the result sought at any given moment. I think the majority opinion closes its eyes to reality in this respect. We are not required "to pretend not to know as judges what we know as men." Bell, J., in

923

*Johnson v. Branch,* 364 F.2d 177, 182 (4th Cir. 1966).

Accordingly, I would affirm the judgment of the district court for the reasons I have stated and for the first two reasons in Judge Miller's concurring opinion, 399 F.Supp. 801, 808 (D.Md.1975).