### In the Matter of the Petition of Ellis OLKON for Readmission to Practice.

#### Misc. No. 4–80–7.

United States District Court,
D. Minnesota,
Fourth Division.

March 27, 1985.

---

Theodore J. Collins, St. Paul, Minn., Nancy K. Olkon, Minneapolis, Minn., for petitioner.

Jon M. Hopeman, Asst. U.S. Atty., Minneapolis, Minn., for U.S.

Before RENNER and MAGNUSON, District Judges.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

Before the court is the application of Ellis Olkon for readmission to the federal bar pursuant to District of Minnesota Rule of Practice 1.G. A hearing on the matter was held on December 12, 1984 before Judges Robert G. Renner and Paul A. Magnuson, and the matter was taken under advisement. Theodore J. Collins, Esq. and Nancy K. Olkon, Esq. appeared for Petitioner. Jon M. Hopeman, Esq. appeared for the United States.

## FACTS

On September 20, 1979, the Hennepin County District Court convicted Petitioner Ellis Olkon of two counts of the felony attempted theft by swindle. Olkon had attempted to defraud two insurance companies by presenting the personal injury claims of a client whom Olkon knew was not injured. *State v. Olkon,* 299 N.W.2d 89 (Minn.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). Judge Amdahl, then of the Hennepin County District Court, sentenced Olkon to five years probation and fined him ten thousand dollars. As a result of his felony conviction, Petitioner was temporarily suspended from the Minnesota state bar on March 30, 1980 for the duration of his criminal probation, or for two years, whichever was longer. *In re Petition for Disciplinary Action Against Ellis Olkon,* 324 N.W.2d 192 (Minn.1982). A divided court of five to three held that Olkon would be automatically reinstated upon completing the terms of his suspension. *Id.* at 196 (Justice Amdahl did not participate in the decision). As noted by the dissent, the automatic reinstatement precluded a review of Olkon's fitness to practice once his suspension had expired. *Id.* at 197 (Todd, J., dissenting).

On May 12, 1980, Olkon was indefinitely suspended from practice in federal court pursuant to District of Minnesota Rule of Practice 1.F(a). *In re Suspension of Ellis Olkon,* Misc. 4–80–7 (D.Minn. May 12, 1980). Rule 1.F(a), governing disbarment and discipline, provides: "Any member of this court who has been suspended or disbarred from the bar of the State of Minnesota or who has been convicted of any criminal offense in any United States District Court shall ... be suspended from practice before this court." Unlike the state suspension Order, the federal Order declined to set a specific suspension period. It also declined to waive the investigation and hearing process.

On March 6, 1984, Olkon was readmitted to the Minnesota bar. *In re Petition for Disciplinary Action Against Ellis Olkon,* 345 N.W.2d 247 (Minn.1984). Justice Yetka for the court, deemed that compliance with Rule 18 of the Minnesota Rules on Lawyers Professional Responsibility was inapplicable. *Id.* Rule 18 requires an investigation and report by the Director of the Lawyer's Professional Responsibility Board into a petitioner's suitability to practice law before readmission. The rule also gives the court discretion to conduct a hearing on the petition for reinstatement. Minnesota Rule on Lawyer Professional Responsibility 18(b), (d).

On March 8, 1984, Olkon filed a petition for readmission to the federal bar. Pursuant to District of Minnesota Rule 1.G(a), governing reinstatement of disbarred and suspended attorneys, the United States Attorney's Office conducted an independent investigation of Olkon's character and fitness for readmission and submitted the U.S. Attorney's Report of Investigation (Report). The Report recommended denial of Olkon's petition for reinstatement. This recommendation was based on evidence of unethical conduct by Olkon which was unassociated with his prior conviction. The evidence consisted of affidavits, F.B.I. reports, transcripts of phone and body taps, Grand Jury transcripts, and personal interviews. The Report alleged a number of ethical violations: that Olkon knowingly

advised his clients on how to avoid arrests for prostitution; that he knowingly referred women clients who could not pay his fee to another client who conducted a prostitution business; that he used information obtained from clients who were prostitutes with intent to extort government officials, including judges; that he bribed judges; that he used police and court documents to further his client's prostitution business; that he encouraged illegal campaign contributions; that he practiced law after suspension; and that he improperly importuned a witness and interfered with a juror.

■ In rebuttal, Olkon submitted the Petitioner's Response to U.S. Attorney's Report of Investigation (Petitioner's Response).[1] Proceeding on the assumption that the United States Attorney had secured attorney client waivers from Olkon's former clients, Olkon addressed each allegation in the Report. The Court is satisfied that Olkon successfully rebutted a number of the allegations, for example: that he used information obtained from his clients who were prostitutes to extort government officials, including judges; that he bribed judges; that he used police and court documents to further his client's prostitution business; that he encouraged illegal campaign contributions; and that he importuned a witness and interfered with a juror.

■ A hearing was held on December 12, 1984 before Judges Robert G. Renner and Paul A. Magnuson to consider Olkon's petition. Olkon took the stand and testified that he was of good moral character and that he had committed no crimes.[2] Olkon did not present any other witnesses on his behalf. The Petitioner refused the Court's offer of a continuance permitting him to present witnesses to rebut the allegations in the Report. Although Olkon has succeeded in rebutting some of the allegations of unethical conduct, we find that he is insufficiently rehabilitated to be readmitted to the federal bar.

## STANDARD FOR REINSTATEMENT

■ In a reinstatement proceeding, the applicant bears the burden of establishing "by clear and satisfactory evidence ... that [he] has undergone such a moral change as to now render him a fit person to enjoy the public confidence and trust once forfeited." *Peterson v. Sheran*, 474 F.Supp. 1215 (D.Minn.1979) (citing *In re Smith*, 220 Minn. 197, 200, 19 N.W.2d 324, 326 (1945)), *aff'd in part, vacated in part on other grounds*, 635 F.2d 1335 (8th Cir. 1980). The petitioner bears this heavy burden because it is essential that members of the bar be trustworthy and of good moral character.

It is a fair characterization of the lawyer's responsibility in our society that he stands 'as a shield' ... in defense of right and to ward off wrong. From a profession charged with such responsibility there must be exacted those qualities of truth speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.'

*Schware v. Board of Bar Examiners*, 353 U.S. 232, 247, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring). Once an attorney engages in conduct indicating insensitivity to ethical demands, the bond between bench, bar, and public is severed and must be reconciled by the attorney before readmission is granted. "There is no vested right in an individual to practice law. Rather there is a right in the Court to protect itself, and hence society, as an instrument of justice." *In re Isserman*, 345 U.S. 286, 289, 73 S.Ct. 676, 677, 97 L.Ed. 1013 (1953), *judgment set aside*

---

1. At the request of the United States Attorney, the Report and the Petitioner's Response were sealed until the hearing. *In re Petition of Ellis Olkon for Readmission to Practice*, No. Misc. 4–80–7 (D.Minn. Dec. 7, 1984).

2. Olkon made no exception for his felony conviction. The court notes that this could well indicate that he is neither remorseful nor repentant and does not acknowledge his previous wrongdoing.

*on other grounds,* 348 U.S. 1, 75 S.Ct. 6, 99 L.Ed. 3 (1954); *see also Ex parte Wall,* 17 Otto 265, 107 U.S. 265, 27 L.Ed. 552 (1882).

Consequently, Petitioner must bear the difficult burden of persuading this court to grant readmission by demonstrating that he is adequately rehabilitated. *See In re Braverman,* 549 F.2d 913, 919 (4th Cir.1976). An adequate showing of rehabilitation and fitness to practice requires a demonstration of strict adherence to the ethical rules. The reinstatement must be warranted by stronger proof of good moral character and trustworthiness than that required in an original admission to the bar. *See Peterson,* 474 F.Supp. at 1224. In order to transcend the attorney's former unethical actions, an attorney seeking readmission "has the duty to be truthful in proceedings seeking reinstatement.... [F]ailure to be truthful would support a conclusion that the applicant has not been sufficiently rehabilitated to deserve reinstatement as a member of the bar." *Braverman,* 549 F.2d at 916. Due to the vital social interests at stake, any doubts as to a petitioner's fitness to practice in federal court should be resolved in favor of the public and court. *See Isserman,* 345 U.S. at 289, 73 S.Ct. at 677; *In re G.L.S.,* 586 F.Supp. 375, 379 (D.Md.), *aff'd,* 745 F.2d 856 (4th Cir.1984).

## ANALYSIS

Under District of Minnesota Rule 1.G(a), when an attorney applies for readmission, the "United States Attorney shall investigate the facts alleged in the petition for reinstatement and shall present to the court, in affidavit form or otherwise, any facts in support of or against the granting of said petition." The Report on Ellis Olkon alleged, *inter alia,* that Petitioner knowingly advised his clients on how to avoid arrests for prostitution; that he knowingly referred his women clients who could not pay his legal fee to another client who conducted a prostitution out-call service; and that he practiced law after his suspension.

Many of the allegations in the Report were based on the testimony of one Daniel Bahler, Olkon's client who managed and owned a prostitution business. Bahler was arrested in 1982 and at that time he began to cooperate actively with the F.B.I. As discussed at length in Petitioner's Response, and as implicitly conceded in the Report, Bahler's credibility is far from exemplary. Petitioner's Response at 8; Report at 18–19. We do not base our factual findings on Bahler's testimony alone. Many of Bahler's statements are corroborated by documents and other testimony. In addition, Olkon's own statements in his written response lend support to some of the allegations.

Bahler claimed that Olkon knew from the beginning that his massage service, the "Bunny Hutch," was a front for a prostitution business. This allegation is corroborated by a secretly recorded conversation between Olkon and Deborah Johnson, a former employee of Bahler's who had been arrested for prostitution. Report Exhibit G at 021. The conversation occurred on February 27, 1980 in Olkon's office, while Johnson was wearing a consensual monitoring device provided by the Minneapolis police. Report at 28. During this initial client conference, Johnson informed Olkon that she had worked for Bahler and then got a "straight job." She informed Olkon that Bahler later contacted her and asked her to come back to work for him. Olkon commented, "You don't want to go back, you said it was horseshit.... Other girls who worked for him always complained because he wanted to turn tricks with them and stuff like that." Clearly, Olkon was aware of the Bunny Hutch's true business purpose.

Although Olkon denies any knowledge of the illegal activity, Petitioner's Response at 15–16, his knowledge of the Bunny Hutch's actual nature can be implied through comments in his own written response. In attempting to rebut the Report's allegations for extortion, Olkon related an instance where the Minneapolis Star published several articles about well-known public figures who were customers of prostitutes.

Olkon's written response states: "At the request of the *Star* reporter, Petitioner extended the *Star's* invitation to Mr. Bahler to come forward with information about such persons who were customers of his service if he wished to do so." Petitioner's Response at 17. Similarly, in rebutting the Report's allegation that Petitioner used police and court documents to further Bahler's prostitution business, Olkon implicated himself by stating: "In defending employees who worked at the Bunny Hutch who were arrested for prostitution, Petitioner frequently held Sharich hearings and as a part of such hearings secured the necessary statistical information for the Court." Petitioner's Response at 23.

Olkon's denial of his knowledge of the true nature of Bahler's business demonstrates a reluctance to be truthful in this proceeding. As acknowledged by the Fifth Circuit in *In re Braverman*, "failure to be truthful would support a conclusion that the applicant has not been sufficiently rehabilitated to deserve reinstatement." 549 F.2d at 916.

Olkon performed the legal paperwork to incorporate the Bunny Hutch. Report at 21. In addition, Bahler claimed that Olkon gave him advice on how his prostitution business could avoid detection by the police. *Id.* at 20. Allegations of assisting a client in conducting criminal activities are corroborated by two other former clients—Judith Ruth Johnson and Craig Felty. Judith Johnson, who worked for another prostitution out-call service represented by Olkon, informed the F.B.I. that Olkon had personally advised her how to engage in prostitution without being arrested. *Id.* at 39. Craig Felty, who was formerly an assistant to Bahler, started his own out-call prostitution service, called the "Bunny Patch," in July of 1980. Felty informed the F.B.I. that Olkon knew of the true nature of the business and helped him establish and incorporate the business. Felty also alleged that Olkon agreed in advance to handle all prostitution cases arising from arrests of Bunny Patch employees. *Id.* at 29.

Evidence that Olkon regularly contracted to handle client's prospective prostitution arrests is contained in a recorded telephone conversation which occurred between Olkon and Bahler on July 11, 1980. Report Exhibit H. In discussing an employee of Bahler's who was charged with prostitution, Olkon commented: "The only question I have is should I get the money from the girl or are you paying it or...." Bahler responded: "No, uh, yeah, *its taken care of the usual way.*" *Id.* at 1051 (emphasis added). Olkon later stated: "Okay, but, bill her but you'll pay her and then she brings it here, is that it?" Bahler responded: "Right. Right." *Id.* at 1052.

Although this jurisdiction has not adopted the ethical standards promulgated by the American Bar Association, we acknowledge their persuasive authority. "As the profession's own expression of its ethical standards, [the ABA Model Code and Rules of Professional Responsibility] provide substantial guidance to federal courts in evaluating the conduct of attorneys appearing before them." *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 172 (5th Cir.1979); *see also NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 129 (2nd Cir.1976); *Greenebaum-Mountain Mortgage Co. v. Pioneer National Title Insurance Co.*, 421 F.Supp. 1348, 1351 (D.Colo.1976) Kramer, *The Appearance of Impropriety Under Canon 9: A Study of the Federal Judicial Process Applied to Lawyers*, 65 Minn.L.Rev. 243, 246 (1980–1981). An application of these well-recognized and highly-regarded norms is warranted pursuant to our general supervisory authority to regulate attorneys appearing before this court. *See United States v. Springer*, 460 F.2d 1344, 1354 (7th Cir.), *cert. denied*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972).

A lawyer must not counsel or assist a client in conduct that the lawyer knows to be illegal. ABA Code of Professional Responsibility DR 7–102(A)(7); ABA Model Rules of Professional Conduct 1.2(d).

A lawyer should never counsel his client on how to violate the law and avoid pun-

ishment therefor.... "There is a sharp distinction ... between advising what can lawfully be done and advising how unlawful acts can be done in a way to avoid conviction. Where a lawyer accepts a retainer from an organization, known to be unlawful, and agrees in advance to defend its members when from time to time they are accused of crime arising out of its unlawful activities, this is equally improper."

ABA Code of Professional Responsibility EC7–5 & n. 15 (quoting *ABA Opinion* 281 (1952)). Olkon's advice and legal services to Bahler, Felty, and Johnson violated these standards. Moreover, Olkon's original suspension was premised on the same type of unethical behavior. Petitioner has presented no evidence to show rehabilitation from his past untrustworthy behavior.

Disciplinary Rule 7–102(A)(7) and Model Rule 1.2(d) also forbid a lawyer from counselling a client to engage in criminal conduct. Bahler claimed that Olkon often referred clients to him for employment when they could not afford to pay their legal fees. Bahler advised that most of Olkon's referrals were professional prostitutes. Bahler's allegations are corroborated by Jodi Benson, a former client of Olkon's who was a professional prostitute. Report at 34–35. Benson met with Olkon at Olkon's office sometime in July of 1979 to pay part of her bill for legal services rendered earlier in the year. Benson claims that when Olkon learned that she was a self-employed prostitute, he told her that he could call Bahler and that Bahler would give her a job at the Bunny Hutch. *Id.* at 35. Olkon gave Benson Bahler's phone number. She called Bahler as soon as she returned home and left her name and number. Benson's call was promptly returned by Bahler, who asked her to come to his home for an interview.

Evidence of Olkon's referral and Benson's call is found in a telephone message book belonging to Bahler, which was obtained by the F.B.I. *See* Report Exhibit I. An entry dated July 17, 1979 reads, "Jodi Benson, ref. by Ellis 823–7426." *Id.* at 954.

Olkon claims that "ref." could mean "reference by" rather than "referred by" and that perhaps Bahler called Olkon to ask for a character reference. Petitioner's Response at 30. Nevertheless, since Arla Berg, the individual who took the telephone message, was employed as a receptionist at the Bunny Hutch, Report at 10, it is more than probable that she was recording an incoming, rather than an outgoing call.

Bahler's allegations are partly corroborated by secretly recorded statements made by Olkon to Deborah Johnson in February of 1980. *See* Report Exhibit G at 931. After acknowledging implicitly that Johnson was a prostitute when she worked for Bahler, *id.* at 930, Olkon stated:

[I]f you want to go back to Dan's [Bahler], that's your business, I'm not telling you to do it or not because I'm obviously—of all my old clients in the out-call service, I think he's the only one that's still around after about six or seven years. Everybody else is gone and come.... So it doesn't matter to me if you work for Bahler, the Body Shop, Dolphin, or Jonnston's. I guess the only requirement I have is how I am going to get paid.

*Id.* at 931.

Judith Ruth Johnson also alleged that Olkon referred her to an out-call prostitution service run by his client David Hartman. Report at 38. Olkon's referrals of prostitutes to the Bahler and Hartman out-call services constitutes a violation of DR 7–102(A)(7) and Model Rule 1.2(d). Encouraging these women to work as prostitutes to pay their legal fees involves counselling a client to engage in criminal conduct.

The Report cited many events that occurred after Olkon was suspended from practice. When Craig Felty contacted Olkon regarding the establishment of a new out-call service, Olkon informed Felty that Mark Lofstrom, another lawyer from the law firm, would give him all final legal advice. Nevertheless, Felty claimed he never dealt with any attorney in Olkon's office other than Ellis Olkon. Report at 29. Lofstrom specifically recalled that he

never met Felty, nor did he incorporate an organization for Felty called the Bunny Patch. *Id.* at 55. Similarly, Bahler said he was informed by Olkon that although Olkon would continue to do legal work for Bahler after his suspension, his associate, Mark Lofstrom, would have to take any cases to court.

Pursuant to a search warrant, the F.B.I. searched the Bahler residence and the Bunny Hutch on Friday, July 24, 1980. A phone tap, authorized by the Honorable Edward J. Devitt, had previously been placed on the Bunny Hutch line. Three conversations recorded on July 24, 1980 pertaining to the Bunny Hutch search and Ellis Olkon, were submitted by the United States Attorney's Office. Another conversation, recorded on July 11, 1980, pertains to a prostitution case Olkon agreed to take at Bahler's request. Report Exhibit H. Clearly, these conversations indicate, to some extent, Olkon's contact with and representation of Bahler and the Bunny Hutch after his suspension.

Olkon argues that "these exhibits show no more than Petitioner asking routine questions any paralegal or secretary would ask and also specifically indicate that other attorney's in the office would provide the legal services required." Petitioner's Response at 25. We agree with Petitioner's interpretation of his statements. Nevertheless, it is important to note that he expressly denies participating in the July 24th phone calls and rendering any services on behalf of Bahler after April of 1980. Petitioner's Response at 9–10. Petitioner claims that on July 24, 1980 he was at Harvard Law School attending a seminar. Olkon's call to Bahler on July 11 was made on a Saturday. In the conversation, he explains that he will be leaving that Sunday for Harvard and will be gone for only six days. Report Exhibit H at 2, 3. Therefore, he would have returned from Harvard on Friday, July 17—a week before the raid on the Bunny Hutch. Olkon's statements are inconsistent with the logical conclusion the Court draws from the facts.

Based on the Report, the Petitioner's Response, the affidavits, transcripts, and the hearing on the Petitioner's application for reinstatement, we conclude that Olkon has failed to establish by clear and convincing evidence that he has sufficiently rehabilitated himself to the level required of an attorney to practice in federal court. In making this decision, we realize that it may appear to be contrary to the ruling of the Minnesota Supreme Court. The Third and Fourth Circuits have noted the importance "of symmetry in the standards of qualification of coordinate courts in the same state." *In re Braverman,* 549 F.2d 913, 914 (4th Cir.1976); *In re Abrams,* 521 F.2d 1094 (3d Cir.), *cert. denied,* 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975). The *Abrams* court noted that disparate treatment would result in "confusion in the minds of the public, which justifiably may speculate why an attorney not qualified to practice in a federal court has sufficient moral character to practice in the state court." 521 F.2d at 1106.

Although we acknowledge the importance of similar treatment in the state and federal courts, we must also recognize that federal district courts have an independent power to discipline attorneys who have been admitted to practice before the federal bench. *In re Ruffalo,* 390 U.S. 544, 547, 88 S.Ct. 1222, 1224, 20 L.Ed.2d 117 (1968); *Theard v. United States,* 354 U.S. 278, 77 S.Ct. 1274, 1 L.Ed.2d 1342 (1957); *Selling v. Radford,* 243 U.S. 46, 37 S.Ct. 377, 61 L.Ed. 585 (1917); *In re G.L.S.,* 745 F.2d 856, 859–60 (4th Cir.1984); *Abrams,* 521 F.2d 1094; *see* U.S. Const. Art. III, § 1; 28 U.S.C. §§ 1654, 2071; Fed.R.Civ.P. 83. *See generally* Comment, *Disbarment in the Federal Courts,* 85 Yale L.J. 975 (1976). In addition, "although the public may perceive an anomaly to be created when concurrent courts disagree as to an applicant's fitness to practice in their courts, the public is best served by an independent assessment of an applicant's character in each court." *In re G.L.S.,* 586 F.Supp. 375, 379 n. 4 (D.Md.), *aff'd,* 745 F.2d 856 (4th Cir.1984); *accord* Comment, *supra,* at 982–83.

**792**

■ To strike a balance between the need for symmetry and the independent authority of this court to establish standards for its bar, we must give "proper deference" to the state court decisions. *See Braverman,* 549 F.2d at 921; *Abrams,* 521 F.2d at 1101; *G.L.S.,* 586 F.Supp. 375. Yet complete deference cannot be granted without stripping the federal court of its power to govern its own bar. In *G.L.S.,* the United States District Court for the District of Maryland listed a number of relevant factors to consider when determining whether a federal court should defer to a state court's determination:

> Proper deference, we believe, requires this Court to look closely at the state court decision granting or denying admittance to the state bar, to assess the reasons given for the decision, and to take into consideration whether the opinion was or was not unanimously rendered and, as well, to examine the mechanisms available to the Court, if any, by which an independent investigation as to the moral character of an applicant as might be conducted.

*Id.* at 378.

■ In a case such as this, where an independent federal hearing and investigation was conducted and where the federal court does not base its decision on the original state action or the state court's subsequent proceeding, a federal court's determination regarding reinstatement is rightfully independent from a state court's interpretation. *Cf. Abrams,* 521 F.2d at 1101 (power of federal district court to discipline its attorneys may be limited to the extent the district court relies on the state's legal or factual determination). The allegations raised in the Report and the evidence supporting them were not before the state when it conducted its disciplinary proceedings. Since additional facts have been brought to this Court's attention, we believe a deviation from the usual practice of relying on state court disciplinary proceedings is warranted. Moreover, the state did not conduct an investigatory hearing prior to reinstating the Petitioner. The decision to proceed without a Rule 18 inves-

tigation and hearing was made by a divided court before this evidence had surfaced. We believe that the state may well have required such a proceeding had such allegations been raised.

■ In denying Petitioner's application for readmission, we imply no disrespect to the Minnesota Supreme Court. As noted by the United States District Court for the District of Colorado in *In re Mattox,* 567 F.Supp. 415 (D.Colo.1983), courts of limited jurisdiction have a slightly different concern in maintaining discipline than a state bar authorizing the general practice of law:

> While both courts have an abiding concern for the maintenance of the highest standards of ethics and professional responsibility on the part of those attorneys who comprise the bar, the Supreme Court of Colorado must concern itself as well with the rights of members of its bar to sustain a livelihood. The United States District Court, however, is a court of limited jurisdiction. Practice in this court constitutes only a part of the overall practice of law; most lawyers admitted to practice in the State of Colorado do not practice in the federal courts. The only reason for membership in the bar of this court is to engage in litigation before our District Judges, Bankruptcy Judges and United States Magistrates. Because of the demands of the federal practice, the volume of documents and case files confronting each judge and the vicissitudes and complexity of federal legislation, a high degree of trust and reliance must be reposed in the members of this bar. Other courts, of course, also rely heavily on the trustworthiness and honor of the bar. In this court, however, such reliance is indispensable to the very functioning of the court.

*Mattox,* 567 F.Supp. at 417.

### ORDER

IT IS ORDERED that Petitioner's application for readmission is denied without prejudice to Petitioner's right to reapply for readmission after four years from this date and upon demonstrating that he is sufficiently rehabilitated to practice before the federal bench.

RENNER, District Judge, concurring.

I join with Judge Magnuson and concur in the foregoing findings and order. I do this, however, solely because we, as a court, have not adopted a per se rule providing for disbarment of any attorney convicted of a felony for actions committed within the scope of his or her legal practice. *Cf. In re Goldman*, 124 Ariz. 105, 602 P.2d 486 (1979) (felony conviction is conclusive evidence of facts establishing lack of fitness to practice law); *People v. McGonigle*, 198 Colo. 315, 600 P.2d 61 (1979) (use of professional status to commit felony demands disbarment); N.Y.Jud.Law § 90, subd. 4 (McKinney 1983) (any attorney convicted of a felony is automatically disbarred).

Such felonious wrongdoing betrays the very oath admitting one to membership in the bar. As cited in the memorandum, there is no vested right to practice law. *In re Isserman*, 345 U.S. at 289, 73 S.Ct. at 677. The public has the right to expect impeccable standards of professional responsibility of all who would comprise the bar.

When an attorney betrays this trust, society at large is injured. The privilege to practice must yield to the public's expectations of honesty and integrity.