324 N.W.2d 192 (1982)
In the Matter of the Petition for Disciplinary Action Against Ellis OLKON, a Minnesota Lawyer.
No. 51102.
Supreme Court of Minnesota.
August 31, 1982.
*193 Michael Hoover, Administrative Director on Professional Conduct, Richard Harden, Asst., Lawyers Professional Responsibility Bd., St. Paul, for appellant.
Jack Nordby, Minneapolis, for respondent.
Heard, considered, and decided by the court en banc.
YETKA, Justice.
Ellis Olkon was convicted of two counts of attempted theft by swindle involving insurance fraud on January 9, 1980. He was sentenced to two concurrent five-year prison terms but the terms were stayed and probation was ordered along with restitution and a $10,000 fine. We affirmed the conviction on August 29, 1980, and the United States Supreme Court subsequently denied certiorari. State v. Olkon, 299 N.W.2d 89 (Minn.1980), cert. denied, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981).
Olkon was suspended from practice on March 28, 1980, pending final disposition of disciplinary proceedings. Judge Miles Zimmerman was appointed referee and a hearing was held before him on January 14, 1982. On March 1, 1982, the referee filed findings of fact and conclusions of law with a recommendation that Olkon be suspended for two years, that period to include the time of suspension from March 1980, and that Olkon be placed on probation for the period of his criminal conviction probation or for five years, whichever is longer. In addition, the referee recommended that Olkon be prohibited from handling personal injury cases during the probation period. The director challenges this recommendation on appeal and is requesting that this court order Olkon disbarred.
The facts relating to Count I of the petition for discipline were considered by this court in our review of Ellis Olkon's criminal conviction. State v. Olkon, 299 N.W.2d 89 (Minn.1980), cert. denied, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). The facts are set forth in detail in Olkon, 299 N.W.2d at 92-101 and only will be summarized here.
In early 1978, Hennepin County law enforcement officials requested Walter Powers, a Hennepin County police officer, to take part in an undercover investigation of medical fraud activities. Pursuant to this plan, Powers established a doctor-patient relationship with a medical fraud suspect, Dr. Robert Coifman.
In June 1978, Powers, using the alias Eugene Bowers, and Deputy Sheriff Pamela Lavarre, who used the alias Elizabeth Saunders (and who posed as Powers' girl friend), went to Dr. Coifman's office and *194 told Coifman that they had been in a car accident. Powers complained of lower back pain. Dr. Coifman, his business manager, Nathan Neff, and Powers discussed the possibility of therapy and the wearing of a neck brace. Several days later, Neff referred Powers to respondent for legal assistance.
Prior to his first meeting with Dr. Coifman, Powers had been issued a driver's license and a Hennepin County welfare card under his fictitious name. The Edina Police Department aided in the preparation of a fictitious police accident report which indicated that Powers and Lavarre were involved in an auto accident on June 16, 1978. Law enforcement officials also solicited and received the cooperation of State Farm Mutual Insurance Company and Travelers Insurance Company in the investigation, who were requested to settle any claims made against them on behalf of Powers. The Hennepin County Medical Society also was aware of the investigation.
On June 22, 1978, Powers called respondent's office for an appointment. This conversation and subsequent calls to, and interviews in, respondent's office were tape recorded by Powers. Powers made an appointment to see respondent. On June 26, 1978, Powers and Lavarre went to respondent's office. Respondent's paralegal-secretary, Deborah Juhl, had them execute legal retainer agreements and medical release forms.
Powers and Lavarre were then introduced to respondent as Bowers and Saunders. They indicated that they were living together, were unemployed, and described the accident and their insurance. Lavarre said that her shoulders and lower neck hurt and that she had headaches. Powers indicated that he had lower back pain and stated that he was to be hospitalized. They informed respondent of their contact with Dr. Coifman. Respondent expressed skepticism concerning Dr. Coifman because Coifman's bills were high and because of Coifman's use of hypnotherapy. The following conversation took place at the meeting. ("O" represents Olkon; "P" represents Powers):
O: You don't look sick. But with Coifman on, anybody's sick. Is something really wrong with you?
P: Ah, well, not really. But they decided that I should ah  that I maybe I could get something out of it so they said I should come and see ya.
O: Well, I don't want to know anything about that.
P: Then I won't tell you anything about that.
* * * * * *
O: Ah, what I am concerned about is because under no fault insurance, you need one of three things, in order to qualify for a  for a personal injury lawsuit. 1  you have to lose at least 2 months from work, but that's not gonna be the case, as neither one of you were working at the time of the accident. Or  2  if you have ah, up to $4,000 worth of medical bills, or hospital medication bills, which if you see Coifman, won't be a problem. I mean, I, I, I've never met that guy, and I don't want to meet him, but, ah, I guess I don't want to look a gift horse in the mouth. Cause I'm unhappy with him, ya know. And the third thing is to have a permanent injury and that you'll probably have, cause Coifman finds permanent injury.
* * * * * *
O: You're hurting, in pain, possibly hospitalized.
P: Don't laugh.
Olkon, 299 N.W.2d at 94. Respondent then notified the Travelers Insurance Company and State Farm of the accident and of the possible cause of action. Respondent forwarded the accident report and repair bill.
Thereafter, Powers received medical treatment for lower back pain from both Dr. Coifman and Dr. Joseph Engel, a consulting psychiatrist who had no relationship to Dr. Coifman. Respondent received medical reports which described Powers' treatment.
*195 Olkon subsequently settled the alleged claim of Powers and distributed the proceeds. Based on these activities, the grand jury indicted Olkon for insurance fraud and the jury convictions followed along with the petitions for disciplinary action.
The facts relating to Count II of the petition for discipline are not in dispute. On December 20, 1978, Olkon received $12,000 in insurance settlements for the claim the subject of Count I. On December 21, 1978, he disbursed the proceeds to his client Powers, to Dr. Coifman and to himself for attorney fees. In addition, he set aside $1,538 to reimburse the Hennepin County Welfare Department for medical bills which it had paid.
The entire amount of the settlement initially was placed in Olkon's trust account. Olkon's legal secretary testified that when she made out the checks for disbursement, she inadvertently included the amount of the welfare department's possible lien in the check to Olkon for his fees, and placed that check in Olkon's personal account. Olkon left for vacation and did not return until January 15, 1979. When he returned, he saw the cancelled check and corrected the mistake by writing a check for the amount of the welfare lien and depositing it in the trust account. He then wrote the county a letter advising them that the money was being held in trust pending a claim.
The referee found that "[w]hile the failure to deposit the money in a trust account was improper, it was not intentional, of momentary duration only, and understandable under the circumstances." He concluded that the facts did not warrant discipline and recommended that Count II be dismissed.
The director accepted all of the referee's findings and conclusions except Findings 10 and 11 and Conclusion II.[1] The director recommends disbarment.
This court has concluded that the referee's findings, conclusions and recommendations are legally correct and justified by the facts presented. We therefore adopt them in full as the findings, conclusions and disposition of this court.
On appeal, the director urges that this court order automatic disbarment because of the activities of respondent. As this court has stated previously, however, "[w]e * * * recognize that felony convictions do not result in automatic disbarment."[2]Matter of Hedlund, 293 N.W.2d 63, 67 (Minn.1980); Matter of Scallen, 269 N.W.2d 834 (Minn.1978); In re Scholle, 274 N.W.2d 112 (Minn.1978). Rather, whether to order disbarment involves a consideration of the unique circumstances of each case and "each case must be decided on its own facts." Hedlund at 67. Disbarment is the extreme or ultimate penalty for a lawyer's misconduct and exists primarily as a necessary adjunct to criminal prosecution penalties, to protect the public and to deter lawyers who may otherwise be tempted to perform illegal acts. Accordingly, we must *196 examine the individual facts of this case to determine the sanction to be imposed upon respondent.
While the final responsibility for determining the discipline to be imposed upon an attorney rests with this court, "[w]e have in the past and will in the future continue to place great weight upon the recommendations of the referee * * *." In re Scallen at 841. After examining the facts of this case, with due deference to the findings of the referee, we find that the penalty of disbarment is not necessary to serve the stated goals of protecting the public and deterrence.
First, we believe the sanctions recommended by the referee will serve to deter such conduct by members of the bar in general and by respondent specifically. Respondent has been convicted of a felony, placed on probation, and become the subject of much adverse publicity. In addition, under the recommendations of the referee, respondent has been suspended from the practice of law, placed on probation coterminous with the criminal probation, and forbidden from practicing in the area of personal injury law for that period. It is inconceivable that these sanctions will not act to deter conduct of the type in which respondent engaged. We also stress that disbarment remains as a sanction for conduct of this type; only the strong mitigating factors and unique facts of this case prevent us from invoking that sanction here.
Second, we believe the public's interests are best served by allowing respondent to continue to practice law. Respondent has done a great deal of pro bono work and served a segment of the population that might not be able to afford legal services. Many members of the bar and judiciary testified as to the respondent's competence and integrity as an attorney. Permanently depriving the public of respondent's services as an attorney, in view of these factors, seems counterproductive.
Third, we note the following additional mitigating factors. Respondent is guilty of a single offense. Although respondent continues to assert his innocence, the referee, after observing the respondent and weighing the evidence, found respondent to be contrite and remorseful. Respondent has acknowledged his character flaws and obtained counseling. These factors do not excuse respondent's conduct. They do, however, strongly indicate that respondent will not engage in unethical or illegal conduct in the future. Moreover, respondent will be supervised during probation. Thus, respondent does not pose a threat to the public or the bar. We therefore agree with the referee that respondent is not wholly unfit to practice law and that the recommended sanctions are appropriate for this case.
The director also argues that the failure of respondent to keep the welfare funds in a separate trust fund, as set forth in Count II, warrants discipline and aggravates the respondent's criminal conviction. The referee dismissed Count II and we agree. The alleged misconduct was unintentional, due to the secretary's inadvertent error, and did not result in a loss to anyone. Further, respondent corrected the mistake as soon as he learned of it. This incident is unrelated to the criminal conviction and properly was dismissed.
For all of the reasons set forth, we adopt the findings, conclusions and recommendations of the Honorable District Court Judge Miles W. Zimmerman, with the exception that respondent shall be under suspension from the practice of law for the period of his probation and will be reinstated automatically at the conclusion thereof provided he meets all of the terms of that probation.
Let the order be entered accordingly.
AMDAHL, C. J., took no part in the consideration or decision of this case.
TODD, Justice (dissenting).
I respectfully dissent. The facts giving rise to this disciplinary proceedings are set forth in detail in our opinion relating to the criminal felony charges of which Olkon was found guilty, State v. Olkon, 299 N.W.2d 89 *197 (Minn.1980), cert. denied, 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981) and need not be restated or summarized. The simple issue before this court is whether an attorney who is presently suspended from the practice of law for commission of two felonies arising out of his law practice and is on probation as a result of the sentences imposed in the criminal proceedings should be reinstated to the practice of law. I can find no justification at this time for granting Olkon the right to practice law at the conclusion of his probationary period. Most of the arguments raised before the referee and adopted by the majority opinion are of the type that properly should be addressed to the sentencing judge in support of a plea for probation in lieu of confinement. These arguments fail to address the obligation imposed on this court to enforce the ethical standards of the legal profession. In the preliminary statement to the Code of Professional Responsibility the following is stated:
* * * The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action. Within the framework of fair trial, the Disciplinary Rules should be uniformly applied to all lawyers, regardless of the nature of their professional activities. (emphasis supplied)
I know of no case, nor has such a case been cited in these proceedings, where a lawyer who commits a felony directly related to the practice of law involving dishonesty and fraud has been reinstated to the practice of law while still on probation from the criminal charges which led to the disciplinary proceedings. In my opinion, this court is embarking on a new and dangerous course. It is difficult to conceive how the Board of Professional Responsibility will fulfill its obligations to enforce the Code of Professional Responsibility in light of the wide latitude being adopted by the majority opinion in evaluating the conduct of Mr. Olkon. I would continue the suspension of Mr. Olkon with leave to reapply for admission to practice law no sooner than at the expiration of his probationary period under the criminal charges for which he was found guilty. At that time this court could properly evaluate his conduct. No reason has been advanced that would justify granting an automatic reinstatement at the end of the probationary period. The conduct of Olkon is directly related to the practice of law and thus distinguishes this case from Petition for Discipline of Harold D. Kimmel, Jr., 322 N.W.2d 224 (Minn.1982). Since Olkon is not reentering the practice of law at this time, it appears to me that the action of the majority in granting automatic reinstatement at an undertermined future date does nothing to serve the best interest of the public or the legal profession.
PETERSON, Justice (dissenting).
I join in the dissent of Justice TODD.
KELLEY, Justice (dissenting).
I join in the dissent of Justice TODD.
NOTES
[1] Finding 10 was that, in depositing funds to his own account, respondent had acted unintentionally. Finding 11 concerned factors mitigating Count I. Conclusion II dismissed Count II against respondent.
[2] The director argues for a rule of per se disbarment in the situation of insurance fraud related to an attorney's law practice. We recognize that prior cases in which automatic disbarment did not result involved felony convictions unrelated to the practice of law. Nonetheless, we decline to accept the director's argument. The purpose of disciplinary proceedings is to "[protect] the public and the administration of justice from lawyers who have demonstrated * * * that they are unable * * * to properly discharge their professional duties." Hedlund at 67. In order to achieve that objective, we find the need to consider mitigating circumstances to be important equally in the case of law practice related felonies as with non-law practice offenses. Although a felony conviction related to the practice of law will often make the offense more serious, mitigating circumstances might exist in a particular case that will argue for a lesser sanction than disbarment. We also note that the foreign cases cited by the director do not stand expressly for a rule of per se disbarment. Rather, in those cases, insufficient mitigating circumstances were found to support a penalty of less than disbarment. E.g., Attorney Grievance Commission v. Pine, 291 Md. 319, 435 A.2d 419 (1981); In re Silverton, 14 Cal.3d 517, 121 Cal.Rptr. 596, 535 P.2d 724 (1975).