**In the Matter of the DISCIPLINE OF Raymond E. DANA, as an Attorney at Law.**

**No. 14635.**

Supreme Court of South Dakota.

Argued May 20, 1987.

Decided Nov. 25, 1987.

David R. Gienapp of Arneson, Issenhuth & Gienapp, Madison, for respondent.

R. James Zieser, Tyndall, for Disciplinary Bd. of the State Bar of S.D.

## ORIGINAL PROCEEDING

MILLER, Justice.

This original proceeding concerns the discipline of Attorney Raymond E. Dana (Dana).

Dana was convicted June 14, 1984, of the Class 2 misdemeanor[1] charge of concealment of bank transactions in violation of SDCL 51–15–8. He was ordered to pay a $100 fine and over $300 in costs. This court, upon learning of the conviction, issued an order requiring Dana to show cause why he should not be suspended from the practice of law in this state. We subsequently determined that Dana's conviction was not for a serious crime within the meaning of SDCL 16–19–36,[2] therefore the matter was referred to the Disciplinary Board (Board) for investigation and recommendation. After a hearing, Board recommended disbarment. On June 19, 1986, a formal hearing was held before Circuit Judge Jay Tapken, referee. Findings essentially identical to the facts enumerated below (some findings were conclusions of law and therefore were omitted in our factual outline) were entered by the referee. He determined that Dana did not violate any provisions of the Code of Professional Responsibility as alleged by Board and he recommended dismissal of the Board's accusations.

## FACTS

Dana was admitted to the South Dakota Bar in 1939. He practiced law in Sioux Falls, South Dakota, until 1942 when he

1. Carrying a maximum penalty of a $100 fine and/or thirty days in the county jail.

2. SDCL 16–19–36 provides:
 The clerk of any court in this state in which an attorney is convicted of a serious crime shall within ten days of said conviction transmit a certificate thereof to the Supreme Court. The term "serious crime" shall include any felony and any lesser crime a necessary element of which, as determined by the statutory or common law definition of such crime, involves improper conduct as an attorney, interference with the administration of justice, false swearing, misrepresentation, fraud, willful failure to file income tax returns, deceit, bribery, extortion, misappropriation, theft, or an attempt or a conspiracy or solicitation of another to commit a serious crime.

left to spend three and one-half years in the military. After his discharge, he resumed his law practice in Sioux Falls. In 1950, he became a partner in the firm of Dana, Golden, Moore & Rasmussen. He continued his association with that firm until approximately 1965, when he moved to Minneapolis, Minnesota, where his business interests and occupations were primarily in the areas of banking and real estate. Dana has not practiced law in South Dakota since 1970; however, he has maintained his South Dakota Bar membership. His name remained on the firm's title for many years. After 1970, he would from time to time receive a fee from the law firm as a result of payments from clients he had represented prior to his leaving the firm.

The accusations presently under consideration result from Dana's association with the Community Bank of Hartford, South Dakota (Community Bank). Apparently, Dana became associated with Community Bank in 1939. At that time, John Wood was Community Bank's president. Wood allowed Dana to maintain branch law offices in the banks operated in Hartford, Humbolt, and Colton, South Dakota. Dana was also counsel for Community Bank. John Wood died in approximately 1950, at which time his son, D.C. Wood, assumed presidency and became majority stockholder. Dana became vice president and a member of the board of directors. In the mid–60s, Dana assumed the main responsibilities for running Community Bank due to D.C. Wood's frequent absences. After D.C. Wood died in 1968, Dana was appointed executor of his estate, having been named in the will. The D.C. Wood estate owned ninety percent of Community Bank stock, as well as an insurance agency associated with the bank. Dana and his wife owned a portion of the remaining shares.

In the latter 1970s, Dana became president of Community Bank while remaining executor of the D.C. Woods estate. His salary for this position had increased over the years from $1,800 to $45,000 per year. Dana's law firm continued as legal advisor to Community Bank. During this time, Dana did not legally advise Community Bank or the estate. He received no compensation as executor or from the law firm for its representation of Community Bank.

In 1979 or 1980, Dana received court authority to sell the estate's shares in Community Bank and the insurance agency. This decision was made because Dana was approaching seventy years of age and D.C. Wood's widow was not able to operate Community Bank in the event Dana would be unable to do so. Dana employed John Jacobson (Jacobson), a Minnesota bank broker and long-time friend, to sell Community Bank for a five percent commission fee. The Wood heirs approved this commission.

Dana ultimately sold the bank for $6,000,000 to Anant Kumar Tripati (Tripati), a businessman now incarcerated in federal prison. Tripati first issued a $1,000,000 check to Dana. Dana later received assignments from Tripati in the amount of $4,500,000. Tripati also paid the broker's fee of $300,000 to Jacobson. As part of the bank sale, Dana was to receive a pension-type payment of $290,000. This, too, was approved by the Wood heirs.

Jacobson had previously agreed to share his broker's fee ($300,000) with an associate named Mertz. According to Jacobson, he later learned Mertz was acting as a principal in the bank sale and Jacobson therefore felt Mertz did not deserve to share in the broker's fee. Anticipating Mertz might sue him for his agreed share of the fee, Jacobson gave Dana $171,500, and Dana then issued Jacobson a $60,000 check drawn on the Wood estate account. Dana kept the balance ($111,500), (deposited it in his personal account) which was supposedly for past favors, legal advice, and loans Dana had given Jacobson over a thirty-year period. (Dana included the amount on his income tax return.) This arrangement allowed Jacobson to tell Mertz he received only a $60,000 broker's fee. The D.C. Wood heirs were aware of and approved this arrangement.

Commensurate with the bank sale, but unrelated thereto, Tripati also proposed to Dana that he could acquire, through his insurance connections, annuities in major

life insurance companies. These annuities were to pay two percent over and above the cost to Community Bank of brokered funds that could be acquired in the market place. Viewing this as a wise investment for Community Bank, Dana purchased $10,-000,000 of brokered funds from a New York broker. These funds were initially wired in a series of transfers to Marquette Bank in Minneapolis and then sent on to be deposited in Imperial Bank in California, pending the receipt by Community Bank of the annuity documentation.

On March 31, 1983, Community Bank was required to make quarterly reports of its condition to the FDIC. On March 31, 1983, $2,800,000 in brokered funds were transferred from the bank's account in Marquette Bank to Imperial Bank in California. This transfer occurred after 2 p.m., the close of Community Bank's business day. At Dana's order, the first quarterly report did not reflect the $2,800,000 transfer.

Without authorization from Dana, Tripati requested Imperial Bank to place the brokered funds in various Fort Lincoln Life Insurance accounts, which were under Tripati's control. Therefore, instead of receiving annuities issued by reliable insurance companies as promised, they received annuities in Fort Lincoln Life Insurance Company for these brokered funds. These annuities turned out to be without requisite financial security, and in reality were worthless.

During this time period, Tripati allowed Dana the use of a Mercedes automobile and also took Dana and an officer of Imperial Bank on a trip to the Fiji Islands. Dana claims he went on the trip so he could be in a position to discuss with Tripati and Imperial Bank the subject of getting adequate securities or a return of the brokered funds.

After secured annuities were not forthcoming and no repayment of those funds was made, a series of meetings was held with the FDIC, South Dakota banking officials, and the Board of Community Bank. Community Bank ultimately was declared insolvent, closed, and Dana no longer served as an officer of Community Bank.

A lawsuit against Dana and the D.C. Wood estate brought by the FDIC resulted in a settlement whereby $2,600,000 of Community Bank's purchase price was paid to the FDIC. The Wood heirs, who retained independent counsel for the lawsuit, received $200,000 in connection with the purchase price through the sale of the insurance agency stock received back from Tripati. Both the Wood estate and the FDIC reserved the right to proceed against the Imperial Bank relating to their losses.

### Board's Accusations

Board accused Dana of three violations of our Code of Professional Responsibility: (1) violation of Canon 5[3] by simultaneously assuming the following roles:

a) Chairman of the Board of Directors of Community Bank;

b) Executor of the estate of D.C. Woods;

c) Member of law firm representing Community Bank;

d) Owner of stock of Community Bank;

e) Husband of owner of stock of Community Bank;

(2) violation of Canon 5, particularly Disciplinary Rule 5-103,[4] in acquiring an inter-

---

3. Canon 5 provides:
 A lawyer should exercise independent professional judgment on behalf of a client.

4. DR 5-103 provides:
 A) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:
 (1) Acquire a lien granted by law to secure his fee or expenses.
 (2) Contract with a client for a reasonable contingent fee in a civil case.

(B) While representing a client in connection with contemplated or pending litigation, a lawyer shall not advance or guarantee financial assistance to his client, except that a lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses.

est in litigation by accepting $111,500 of the sales' commission for selling Community Bank; and (3) violation of Canon 1 [5] by filing a false report regarding the financial condition of Community Bank.

## STANDARD OF REVIEW

■ Because Board contests the referee's decision, we must determine what weight this court shall give the referee's findings, conclusions, and recommended sanction. We have declared that

[w]hile the findings of the referee are not conclusive, we must consider them carefully because the referee had the advantage of seeing and hearing the witnesses. If the referee's findings are supported by the evidence, they will not be disturbed by the Supreme Court.

*In re Rensch*, 333 N.W.2d 713, 714 (S.D. 1983) (citing *In re Theodosen*, 303 N.W.2d 104 (S.D.1981); *In re Goodrich*, 78 S.D. 8, 98 N.W.2d 125 (1959); *In re Schmidt*, 70 S.D. 161, 16 N.W.2d 41 (1944)). *See also In re Willis*, 371 N.W.2d 794 (S.D.1985); *In re Strange*, 366 N.W.2d 495 (S.D.1985).

On the other hand, we give no particular deference to a referee's recommended sanction. The ultimate decision for discipline of members of the State Bar rests with this court. *In re Hopp*, 376 N.W.2d 816 (S.D. 1985); *Willis, supra;* SDCL 16–19–22. Therefore, although we may adopt the findings of a referee, it does not necessarily follow that we will also adopt his recommendations. *Rensch, supra; Strange, supra.*

Neither Board nor Dana dispute the findings as enumerated by the referee. Therefore, we adopt such findings. The referee concluded there was no violation of Canons 5 or 1 and thus he recommended dismissal. We disagree.

### *Was there a violation of Canon 5?*

■ Canon 5 is the "conflict of interest" canon. The findings affirmatively indicate that Dana acted in various roles simultaneously, to-wit: (a) Chairman of the Board

of Directors of Community Bank; (b) executor of the Wood estate that owned a majority of the stock in Community Bank; (c) member of the law firm representing legal interests of Community Bank; (d) owner of bank shares individually; and (e) husband of owner of bank shares. In light of the conflicting interests that these roles inherently produce, there is no doubt that Community Bank, its customers (general public), and the Wood heirs' interests have been detrimentally affected. We conclude that there was a violation of Canon 5 of the Code of Ethics as too many conflicting roles were assumed by Dana, a combination of which prohibited Dana from exercising independent professional judgment toward each of his clients.

First of all, Dana was acting in a number of different capacities for Community Bank at the same time as he was the executor of the Wood estate, with ninety percent ownership in Bank's stock. This may be permissible, however, the problem was that Dana had two separate deals going with Tripati: one secret and one partially secret. The secret deal was an option to purchase the stock which Dana negotiated for the estate. Dana told the Disciplinary Board at its hearing:

So I had received two substantial offers for the sale of the bank, and, of course, the bank board knew nothing of this either, because, in the first place, I don't think that a Board of Directors of a bank has to know what a majority stockholder of the bank wants to do with their stock. And so in that capacity I acted as executor of the estate, and those negotiations were at least as secret as it's possible to keep them. (Transcript p. 16, 12–.6.84)

However, it must be remembered that Dana was not merely the executor, he was the president of Community Bank and chairman of the board of directors. As president and director, he recommended informally to some of the board members that Bank enter into a separate deal with Tripati on the exchange of brokered funds

---

**5.** Canon 1 provides:
 A lawyer should assist in maintaining the in-

tegrity and competence of the legal profession.

for annuities. Some of the board members informally approved this deal and Dana proceeded without formal approval. This is the transaction which eventually destroyed Bank when Tripati arranged for the funds to be transferred to his separate account and the annuities proved worthless. If the board of directors did not have a right to know that Tripati had an option to buy Community Bank, which Dana had negotiated, were they entitled to know that Tripati was paying for Dana's junket to the South Pacific and Dana's use of a luxury car? Did the board have a right to know that Dana was going to take a reward as president of Community Bank from Tripati and that Dana shared in the broker's fee? We are not talking minor remuneration. Dana received $111,500 from the broker and Tripati proposed to reward him with $290,000. How could Dana possibly exercise independent judgment for each position he held? Dana clearly had a finger in everyone's pie.

 Dana claims that the heirs and their attorney have voiced no complaints, thus no violation of Canon 5. However, our ultimate concern must be protection of the public from further wrongdoing by the lawyer. *Rensch, supra.* Dana impliedly argues that since he is 71 years old and no longer practicing in South Dakota the public needs no protection. Yet, an application of common sense would show that the discipline for attorney misconduct also serves to deter similar conduct in the profession which, in turn, fosters and maintains the ethics of the legal profession. *Committee on Professional Ethics & Conduct of the Iowa State Bar Ass'n v. Halleck,* 325 N.W. 2d 117 (Iowa 1982); *Matter of Olkon,* 324 N.W.2d 192 (Minn.1982); *State ex. rel Nebraska State Bar Ass'n v. Kelly,* 221 Neb. 8, 374 N.W.2d 833 (Neb.1985)

Lastly on this issue, Dana argues and the referee agreed that there must be an attorney-client relationship in existence before a lawyer can be disciplined under Canon 5. Board argues that an attorney-client relationship need not exist in order to have a conflict problem, citing SDCL 16–19–31. Further, Board argues an attorney-client relationship did, in fact, exist.

Initially, we note that situations may arise when a lawyer may be disciplined even though he acts outside the practice of law. *Matter of Voorhees,* 294 N.W.2d 646 (S.D.1980). As noted in *Voorhees:*

> Nor can it be suggested that the fact Voorhees was acting in a purely commercial capacity rather than as a practicing attorney when he perpetrated the offense in any manner lessens the need for grave discipline, for that would be the same as saying that if you cannot make an honest buck in the commercial world try the legal profession.

*Id.* at 648. Additionally, SDCL 16–19–31 states:

> The license to practice law in this state is a continuing proclamation by the Supreme Court that the holder is fit to be entrusted with professional and judicial matters, and to aid in the administration of justice as an attorney and as an officer of the court. It is the duty of every recipient of that privilege to conduct himself at all times, both professionally and personally, in conformity with the standards imposed upon members of the bar as conditions for the privilege to practice law.

Here, Dana was bank attorney as early as 1939. Eventually, he moved up in the bank and became president, making a substantial salary. Throughout this entire time, either Dana personally was lawyer or his law firm was representing Community Bank. Additionally, during all relevant time periods, the law firm continued to collect fees and Dana, albeit a small amount, continued receiving money from the firm. We conclude that the aura of the attorney-client relationship was not lost under all circumstances present in this case.

*Was there a violation of DR 5–103?*

The second accusation by Board is that by accepting part of the sales commission from Jacobson, Dana has violated Canon 5, and in particular Disciplinary Rule 5–103. We agree with the referee that there was no violation of DR 5–103 as the fee was not

a part of any litigation or cause of legal action.[6]

### Was there a violation of Canon 1?

 The third allegation involves the alleged filing of a false report of Community Bank's condition as of March 31, 1983. We agree with the referee that Board's proof fails in this allegation. The evidence regarding the daily transactions, reveals that Community Bank's closing time was 2 p.m., despite the fact that the bank remained open for business after that time. (For example, if a deposit was made after 2 p.m. on a given day, that deposit would not show until the next business day.) In this case, Marquette Bank in Minneapolis notified Community Bank at 3:45 p.m. on March 31, 1983, that it had received $2,800,-000 of the brokered funds. When the certificates of deposit were made for that $2,800,000 at a later time, they were dated back to March 31, 1983, being the date of confirmation. When asked by a bank officer as to whether the $2,800,000 in brokered funds should be reported in the first quarter or not, Dana chose to exclude them. This court agrees with the referee that Dana did not cause to file a false report of the bank's condition as of March 31, 1983. As pointed out by Dana's counsel, to report the $2,800,000 as being received on March 31 may well have been the filing of a false report. Thus, no violation of Canon 1.[7]

 Having concluded that Dana has violated Canon 5, and recognizing our responsibility to the general public, the Bench and the Bar, we determine that dismissal as recommended by the referee is inappropriate. Under some circumstances, disbarment would be appropriate, however, everything considered here, including Dana's age, reputation and current status, we hold that he be subject to a public reprimand, and that he pay for all of the costs of this action under SDCL 16–19–70. It will be so ordered.

MORGAN and HENDERSON, JJ., and KONENKAMP, Circuit Judge, concur.

WUEST, Chief Justice, concurs specially.

KONENKAMP, Circuit Judge, sitting for SABERS, J., disqualified.

WUEST, Chief Justice (concurring specially).

I concur with the majority opinion but believe Dana should be suspended for at least three years from the practice of law in South Dakota. In my opinion, he deserves more than a public reprimand.

---

6. However, we feel that there arguably may have been a violation of Canon 9 (appearance of impropriety) and/or DR 1–102 (engaged in conduct involving dishonesty, fraud, deceit or misrepresentation regarding Mertz). Since Board did not cite these specific canons as having been violated and Dana has not had an opportunity to respond, we cannot discipline Dana for the possible violation without causing a deprivation of his due process rights.

7. Dana entered a nolo contendere plea pursuant to plea bargain on a misdemeanor charge of concealment of bank transactions as he was faced with potential felony charges and a one-month trial.